UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DENISE SNYDER, *Administrator of the Estate of Bryan Bargar*<br><br>Plaintiff<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant | Case No.   1:19-cv-770<br><br>Judge<br><br>**COMPLAINT** |

Now comes Plaintiff Denise Snyder, Administrator of the Estate of Bryan Bargar (deceased) and resident of Cuyahoga County, Ohio, by and through counsel, and for her Complaint and causes of action against Defendant United States of America states and alleges as follows:

**SUMMARY OF THE ACTION**

1. This case is brought under the Federal Tort Claims Act, 28 U.S.C. §1346, by Plaintiff Denise Snyder as the Administrator of the Estate of Bryan Bargar, arising from Mr. Bargar's wrongful death in a motor vehicle collision caused by Army National Guard PFC Jeremy R. Taylor while within the course and scope of PFC Taylor's employment by Defendant United States of America.

2. At approximately 6:02 p.m. on September 10, 2016, PFC Taylor drove an Ohio Army National Guard Expanded Capacity military Humvee (*viz.*, a "High Mobility Multipurpose Wheeled Vehicle" or "HMMWV") left of center on State Route 14 (*aka* Cleveland-E. Liverpool Road) in Ravenna Township, Ohio. After striking an oncoming PT Cruiser, the military Humvee driven by PFC Taylor slammed head-on into a Kia Optima driven by Bryan Bargar.

1

3. Bryan Bargar, just 34 years old, and his six-year-old son, Wyatt ▮▮▮▮, were killed by the crash.

4. Bryan Bargar remained conscious and endured extraordinary pain and suffering for at least 37 minutes after the crash.

5. The Ohio State Highway Patrol Crash Reconstruction and Analysis Unit ("Highway Patrol Reconstruction Unit") conducted an investigation, gathered evidence, performed an accident reconstruction, and provided their findings to the Portage County (Ohio) Prosecutor's Office.

6. A Portage County Grand Jury indicted PFC Taylor on two counts of Vehicular Homicide, two counts of Vehicular Manslaughter, and one count of failing to drive a motor vehicle upon the right half of the roadway, all misdemeanor violations of Ohio Revised Code §§2903.06(A)(3)(a)(C), 2903.06(A)(4)(D), and 4511.25.

7. PFC Taylor was subsequently found guilty on all counts in Portage County Municipal Court. PFC Taylor was sentenced to one year in jail with 305 days of his jail sentence suspended. His driver's license was also suspended for two years.

8. The deaths of Bryan Bargar and Wyatt ▮▮▮▮ were not simply the tragic result of an unfortunate "accident." Their deaths were caused by the Army National Guard's leadership and planning failures which placed a sleep-deprived, exhausted, and inexperienced young solider behind the wheel of a large military Humvee in a rain storm on a civilian roadway. The United States Army Accident Safety Investigation unit investigated the circumstances contributing to the fatal collision ("Army Investigation"). The Army Investigation concluded there were multiple incidents of "Leadership Failure," including allowing PFC Taylor just 3 hours of sleep or less, before subjecting him to a long day of training, and then placing him behind the wheel of the Humvee on civilian roads.

9. Bryan Bargar is survived by his four children  ▮▮▮▮ (DOB: ▮▮▮▮), ▮▮▮▮ (DOB: ▮▮▮▮), ▮▮▮▮ (DOB: ▮▮▮▮), and ▮▮▮▮ (DOB: ▮▮▮▮), his mother Ruth Bargar, and his sister Plaintiff Denise Snyder.

10. At the time of his death Bryan was living with his mother Ruth Bargar, sister Denise Snyder, her husband David Snyder, and their two minor children (Bryan's niece and nephew) in the Snyder's home in Berea, Ohio.

## PARTIES, JURISDICTION & VENUE

11. The Cuyahoga County (Ohio) Probate Court appointed Bryan Bargar's sister, Plaintiff Denise Snyder, to serve as the Administrator of his Estate.

12. At all relevant times, PFC Taylor was performing Army National Guard drills and/or training pursuant to 32 U.S.C. §502. Thus, he was an employee of Defendant United States of America and acting within the course and scope of his employment at the time of his tortious conduct giving rise to Plaintiff Snyder's claims. To wit, PFC Taylor was driving in an Army National Guard convoy returning from a training operation mandated by 32 U.S.C. §502. As such, the United States is the proper party defendant, and this Court has original jurisdiction of this case, under 28 U.S.C. §1346(b)(1).

13. Plaintiff has complied with all of the prerequisites to suit required by 28 U.S.C. §2675. To wit, she submitted the Estate's claims to the appropriate federal agency, the Office of the Staff Judge Advocate of the U.S. Army Cadet Command and Fort Knox, on August 13, 2018. A date-stamped copy of Plaintiff's completed Standard Form 95, confirming it was received by the U.S. Army on August 13, 2018, and assigned Army Claim #18-201-T068, is submitted with this Complaint as **Exhibit 1**.

14. To date, the U.S. Army has not made a final disposition of the claims by settlement or written denial. As such, and given the passing of six-months since the claims' submission, Plaintiff has elected to file this action, and has done so in compliance with 28 U.S.C. §§2401(b) and 2675.

15. This Court is a proper venue for this action under 28 U.S.C. §1391(e)(1)(C) because defendant is the United States and the plaintiff resides in the Northern District of Ohio.

## STATEMENT OF FACTS

### Leadership, Planning, and Execution Failures in the Training Operation Created an Unreasonable Risk of Harm to Civilians on the Public Roads

16. At all relevant times, PFC Taylor was a member of Company C, 1st Battalion, 145th Regiment of the Ohio Army National Guard.

17. Members of the Ohio Army National Guard undergo periodic Individual Weapons Qualifications ("IWQ") training pursuant to U. S. Army regulations.

18. PFC Taylor, along with other members of Company C and D of the 1st Battalion, were required to report to the Newton Falls Armory at 8:00 a.m. on Friday, September 9, 2016.

19. The planning for the training weekend was conducted by two unit-readiness Non-Commissioned Officers ("RNCO's"). Both RNCO's went on Temporary Duty instead of staying for the training. This left Supply Sergeants (E-6 rank) in charge of the mission.

20. PFC Taylor arrived at the Newton Falls Armory at or around 8:00 a.m. on Friday, September 9, 2016.

21. The Non-Commissioned Officer in Charge ("NCOIC") of the mission was AWOL. A recovery team was dispatched to find him. The NCOIC arrived approximately 6.5 hours late and did not receive the "battle hand-off" command of the mission until 2:30 p.m.

22. "Lights out" for the soldiers on Friday night was at 12:00 midnight.

23. PFC Taylor and the other soldiers woke up at 3:00 a.m. on Saturday, September 10, 2016. PFC Taylor had, at most, just 3 hours of sleep.

24. After waking up at 3:00 a.m., a 4-vehicle convoy departed the Newton Falls Armory at 4:30 a.m. PFC Taylor drove in the convoy for 3 hours and arrived at Camp Perry at 7:30 a.m. The soldiers then engaged in IWQ for approximately 8 hours.

25. The original combined unit plan scheduled the soldiers to remain overnight at Camp Perry and return to the Newton Falls Armory on Sunday. That plan was not followed. The soldiers instead departed in a convoy back to the Newton Falls Armory at 3:30 p.m. on Saturday, September 10, 2016.

26. At the time of the fatal crash, approximately 6:02 p.m. on Saturday, PFC Taylor had been awake for at least 15 consecutive hours, driven over 5 hours (both to and from Camp Perry), spent approximately 8 hours engaged in IWQ, and had at most 3 hours of sleep. Empty energy drink cans were found inside Taylor's Humvee after the crash.

27. In the original combined unit plan for the mission, the vehicle crew members were assigned to ensure there were experienced drivers for each of the military Humvees—and 20-year-old PFC Taylor was not assigned to drive. That plan was not followed. The four occupants of the Humvee driven by PFC Taylor were between 18 and 20 years old, had been licensed to drive military Humvees for less than four months, and had minimal experience driving them on improved roads with civilian traffic. There were no Non-Commissioned Officers in the vehicle. Indeed, the Army Investigation identified "Human Error—Driver Crew Inexperience" as a contributing factor in the fatal crash.

28. The two most experienced officers in the convoy were both together in the "trail vehicle" in the convoy. During a rest stop at the K-Mart parking lot on State Route 14 in Streetsboro, they reported "overheating issues" with their Humvee and broke off from the convoy, leaving 10 minutes before the other vehicles. This left PFC Taylor's Humvee as the trail vehicle in what was now a 3-vehicle convoy.

29. These systematic breakdowns as well as the negligent supervision of the soldiers, their training schedule, and the convoy resulted in PFC Taylor's fatigue and distraction at the time of the fatal crash.

### PFC Taylor's Negligence Caused the Multi-Vehicle, Double Fatal Crash

30. The 3-vehicle convoy left the K-Mart parking lot in Streetsboro at approximately 5:55 p.m. on Saturday, September 10, 2016.

31. The convoy consisted of a private pickup truck followed by two military Humvees. The Humvee driven by PFC Taylor ("Taylor Humvee") was the trail vehicle.

32. The convoy resumed traveling southbound (technically in the southeast direction) on State Route 14.

33. At all relevant times, it was raining and the road surface was wet.

34. North of the Lake Rockwell intersection ("the intersection"), State Route 14 is a four-lane road with two lanes in each direction separated by double yellow lines.

35. South of the intersection, the southbound lanes of State Route 14 begin to merge into a single lane.

36. There are two yellow traffic signs posted along State Route 14 north of the intersection alerting southbound drivers to the merging lanes. The first yellow sign warns, "RIGHT LANE ENDS." The second yellow sign is the "merge lane ahead" symbol showing the right lane ending ahead.

37. As the convoy traveled southbound in the left lane approaching the intersection, both the lead convoy vehicle (pickup truck) and the second convoy vehicle (Lead Humvee) passed a yellow school bus which was traveling in the right lane.

38. As the first two convoy vehicles passed the school bus north of the intersection, PFC Taylor was driving the Taylor Humvee in the left lane some distance behind the school bus, which was in the right lane. PFC Taylor remarked to the other soldiers in his vehicle that the convoy was pulling away from them. Taylor increased his speed in an effort to catch up.

39. As the school bus traveled through the intersection, it began to merge left into the single southbound lane.

40. Although there is only one southbound lane south of the intersection, it is approximately 23 feet wide and allows enough room to accommodate two vehicles.

41. On the northeast corner of the intersection, there is a private business property equipped with an exterior surveillance video system. One of the surveillance cameras is pointed towards the intersection. Surveillance video subsequently obtained by the Highway Patrol Reconstruction Unit, documented the Lead Humvee, school bus, and the Taylor Humvee as each crossed into and passed through the intersection prior to the crash.

42. The surveillance video evidence enabled the Highway Patrol Reconstruction Unit to calculate the approximate speed of the Lead Humvee, school bus, and Taylor Humvee as each passed through the intersection.

43. The Lead Humvee was traveling approximately 45 mph as it passed through the intersection.

44. The school bus entered the intersection after the Lead Humvee.

45. The school bus was traveling approximately 39 mph as it passed through the intersection.

46. The Taylor Humvee was traveling approximately 48 mph as it passed through the intersection and was rapidly gaining on the school bus as the bus was merging left.

47. Other soldiers in the Humvee told PFC Taylor to slow down because the bus was trying to merge and to look out for it.

48. The school bus did not engage in a cut off maneuver. It gradually began to merge towards the single lane (which starts at the south end of the intersection).

49. The school bus did not cut off the Taylor Humvee.

50. When the Taylor Humvee first appears in the video, it is approximately 39 feet behind the slower-moving school bus. PFC Taylor had between 4.3 and 9.0 seconds from that moment to simply slow to parity speed with the school bus in order to maintain an assured clear distance and avoid contact. This time period is more than enough for a reasonably alert driver to properly react by slowing down.

51. Taylor would have had even more time to slow down if he had been paying reasonable attention to the signs north of the intersection warning that the right lane was ending.

52. Even if the school bus had engaged in a cutoff maneuver, there was more than enough time and distance between the school bus and the Taylor Humvee for a reasonably alert driver to slow down and avoid contact.

53. PFC Taylor, however, swerved into the northbound lanes of oncoming traffic and side-swiped a PT Cruiser driven by Lisa Mancini.

54. After striking the PT Cruiser, the Taylor Humvee continued traveling southbound, (left-of-center) further into the northbound lanes.

55. At all relevant times, Bryan Bargar was driving northbound approaching the intersection.

56. The Taylor Humvee slammed essentially head-on into Bargar's Kia Optima in the northbound lanes of traffic.

57. A second impact between the Taylor Humvee and Bargar's Kia occurred as the vehicles rotated during the collision sequence. Both vehicles traveled off the southeast side of State Route 14 before coming to final rest.

58. At all times relevant, PFC Taylor owed multiple duties to the other users of the roadway, including Bryan Bargar, to:

    a) Maintain a lookout for hazards ahead in the roadway;

    b) Pay reasonable attention to and/or take reasonable actions in response to signs warning of merging lanes ahead;

    c) Drive at a speed safe for the conditions and circumstances of the roadway;

    d) Not become distracted from the primary task of driving;

    e) Maintain control of his vehicle;

    f) Not drive left of center;

    g) Not attempt to pass a vehicle in a no passing zone;

    h) Not drive southbound in the northbound lanes;

    i) Maintain an assured clear distance from other vehicles with the right of way, including Bryan Bargar's Kia Optima and Lisa Mancini's PT Cruiser;

    j) Not operate a vehicle while his ability to drive safely is impaired by sleep deprivation, fatigue, and/or drowsiness; and

    k) Not operate a vehicle while physically incapable of driving safely.

59. PFC Taylor failed to maintain a lookout for hazards ahead in the roadway, including a slower moving yellow school bus merging into the single southbound lane.

60. PFC Taylor failed to pay reasonable attention to and/or take reasonable actions in response to signs warning of merging lanes ahead.

61. PFC Taylor failed to drive at a speed safe for the conditions and circumstances of the roadway.

62. PFC Taylor allowed himself to become distracted from the primary task of driving.

63. PFC Taylor failed to maintain control of the Humvee.

64. PFC Taylor drove the Humvee left of center.

65. PFC Taylor attempted to pass the yellow school bus by crossing over into the northbound lanes in a no passing zone.

66. PFC Taylor drove the Humvee southbound in the northbound lanes.

67. PFC Taylor failed to maintain an assured clear distance between the Humvee and the PT Cruiser.

68. PFC Taylor failed to maintain an assured clear distance between the Humvee and Bargar's Kia.

69. PFC Taylor operated the Humvee while his ability to drive safely was impaired by sleep-deprivation, fatigue, and/or drowsiness.

70. PFC Taylor operated the Humvee while physically incapable of driving safely.

71. PFC Taylor breached one or more of the duties he owed to other users of the roadway, including Bryan Bargar.

72. PFC Taylor was negligent in his operation of the Humvee.

73. One or more of the universal principles of automotive safety violated by PFC Taylor is codified by the Ohio Revised Code. PFC Taylor was therefore negligent *per se.*

74. PFC Taylor's negligent acts and/or omissions directly and proximately caused the collision between the Taylor Humvee and Bargar's Kia.

75. PFC Taylor's negligent acts and/or omissions directly and proximately caused catastrophic and fatal injuries to Bryan Bargar.

76. PFC Taylor's negligent acts and/or omissions caused the death of Bryan Bargar.

77. PFC Taylor's negligent acts and/or omissions caused catastrophic and fatal injuries to Bryan's six-year old son Wyatt ▮.

78. PFC Taylor's negligent acts and/or omissions caused the death of Bryan's minor child Wyatt ▮.

79. PFC Taylor's negligent acts and/or omissions caused Bryan Bargar and/or the Estate of Bryan Bargar to sustain property damage.

80. Bryan Bargar was not negligent and bears no responsibility for causing the collision with Taylor's Humvee. Bryan did not contribute to the crash.

81. Lisa Mancini was not negligent and bears no responsibility for causing Taylor's Humvee to strike the Kia.

### Bryan Bargar Experienced Pre-Impact Terror

82. The Kia was equipped with an Airbag Control Module which documented the evasive actions Bryan Bargar undertook to avoid a crash in the seconds before the initial impact with the Taylor Humvee.

83. Bryan cognitively recognized the immediate threat posed by the massive Humvee traveling left of center in his path, undertook evasive actions, and consciously understood he was about to be involved in a catastrophic collision with the Humvee.

84. Bryan began to perceive the danger created by the Humvee traveling left of center in his path approximately 2.5 seconds before initial impact.

85. Bryan experienced conscious fright prior to the initial impact, exacerbated by the massive size and intimidating stature of the Taylor Humvee as well as his knowledge that his young son Wyatt ▮'s life was in peril.

### Bryan Bargar Experienced Conscious Pain & Suffering

86. The gross vehicle weight of the Taylor Humvee was approximately 8,200 lbs. The Kia's Airbag Control Module recorded a delta velocity of 50.33 mph during the initial impact. Any crash delta velocity greater than 30 mph is considered a severe crash.

87. Bryan sustained a gravitational load of approximately 99 times his normal body weight during the initial impact.

88. The crash deformed the dashboard of the Kia, pushing it downward and pinning Bryan's legs, trapping him in the vehicle. He suffered deep lacerations and massive internal injuries by way of multiple blunt force traumas.

89. First responders arrived at 6:12 p.m. A few minutes later, paramedic Matthew Bowery climbed into the front passenger seat of the Kia and found Bryan trapped and bleeding, but conscious. As firefighters tried to move the Humvee off of the Kia, paramedic Bowery made contemporaneous entries on a tablet computer documenting Bryan's condition.

90. The contemporaneous medical record created on the paramedic's tablet computer documents that Bryan opened his eyes, gave verbal responses (albeit not understandable), followed instructions, and withdrew from pain while being examined by paramedic Bowery.

91. The contemporaneous medical record created on the paramedic's tablet computer confirms that Bryan was conscious until 6:40 p.m.

92. While Bryan maintained consciousness under the crushing weight of the dashboard, he knew his six-year-old son had also sustained severe injuries.

93. For at least 37 minutes, from the time of the crash until losing consciousness, Bryan experienced extraordinary pain and suffering, as well as the mental anguish of knowing his young son had sustained catastrophic and/or fatal injuries in the backseat of the car.

94. Bryan Bargar was declared dead at the scene at 7:21 p.m.

### Bryan Bargar's Surviving Children and Family

95. Bryan Bargar's four surviving minor children, ▇▇▇▇▇ and ▇▇▇▇ are from his marriage to April McCartney (fka "April Bargar"). When Bryan and April

divorced, they agreed on a Shared Parenting Plan. Neither retained an attorney in the divorce or custody proceedings. Initially, Bryan was the residential parent for the children two days per week. When April McCartney later re-married, the children lived full-time with her, but Bryan continued to pay child support.

96. At the time of his death, ███ was 14, ███ was 12, ███ was 11, and ███ was 8 years old.

97. Bryan had an extremely close relationship with his mother Ruth Bargar, his sister Plaintiff Denise Snyder, her husband David Snyder, and their two minor children who were 12 and 8 years old at the time of his death. Bryan Bargar, Ruth Bargar, Denise Snyder, David Snyder, and Bryan's niece and nephew all lived in the same house in Berea, Ohio. Bryan contributed money for the family's living expenses and meals, and he was actively involved with his niece and nephew.

98. At the time of his death, Bryan was working full-time as a mill operator at Superior Roll Forming Company. He also worked a second job delivering pizzas.

## FIRST CAUSE OF ACTION
## WRONGFUL DEATH

99. Plaintiff incorporates and realleges all of the paragraphs of this Complaint as if fully re-written herein.

100. On or about September 10, 2016, PFC Jeremy Taylor negligently operated an Army National Guard Humvee in violation of Ohio traffic laws and reasonable standards of care.

101. PFC Taylor's negligent operation of the Humvee directly and proximately caused the collision with Bryan Bargar's vehicle. Bryan Bargar was killed in the crash.

102. Ohio provides for an action for wrongful death under Ohio Revised Code §2125.01 in those cases in which the death of a person is caused by a wrongful act or neglect.

103. Under O.R.C. §2125.02, such an action is brought by the Administrator for the benefit of the surviving children and mother of the decedent, all of whom are rebuttably presumed to have suffered damages by reason of the wrongful death, as well as for the benefit of

other next of kin who suffered damages including, but not limited to, mental anguish and grief, medical and funeral expenses, and loss of decedent's society and companionship.

104. 32 CFR §536.85 permits the filing of an action against the United States for injury or damage caused by negligent or wrongful acts or omissions of military personnel or civilian employees of the Department of the Army or Department of Defense while acting within the scope of their employment under circumstances in which the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

105. PFC Jeremy Taylor, while within the course of scope of his employment with Defendant United States of America, caused the wrongful death of Bryan Bargar. Therefore, the United States is liable, pursuant to the Federal Tort Claims Act, for such damages and other relief provided for by O.R.C. §2125.02.

## SECOND CAUSE OF ACTION
## SURVIVORSHIP CLAIM

106. Plaintiff incorporates and realleges all of the paragraphs of this Complaint as if fully re-written herein.

107. On or about September 10, 2016, PFC Jeremy Taylor negligently operated an Army National Guard Humvee in violation of Ohio traffic laws and reasonable standards of care.

108. PFC Taylor's negligent operation of the Humvee directly and proximately caused the collision with Bryan Bargar's vehicle. Bryan Bargar sustained catastrophic (and ultimately fatal) personal injuries in the crash.

109. Ohio law permits an Estate to pursue the personal injury claims, including those for conscious pain and suffering and mental anguish preceding death, under O.R.C. §2305.21.

110. 32 CFR §536.85, permits the filing of an action against the United States for injury or damage caused by negligent or wrongful acts or omissions of military personnel or civilian employees of the Department of the Army or Department of Defense while acting within the scope of their employment under circumstances in which the United States, if a private

person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

111. PFC Jeremy Taylor, while within the course of scope of his employment with the Defendant United States, negligently caused Bryan Bargar to sustain catastrophic physical injuries and property damage, suffer conscious pain and suffering, and experience mental anguish prior to his untimely death. Therefore, the United States is liable, pursuant to the Federal Tort Claims Act, for such damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Denise Snyder, Administrator of the Estate of Bryan Bargar, deceased, demands judgment against Defendant United States of America as follows:

a. Compensatory Damages on the Wrongful Death Claim in the amount of $18,034,868.13 plus interest, costs incurred in this action, and attorney's fees;

b. Compensatory Damages on the Survival Claim in the amount of $1,515,770.59 (this includes $15,770.59 in property damage) plus interest, costs incurred in this action, and attorney's fees; and

c. Such other and further relief to which Plaintiff may be entitled under the law.

Respectfully submitted,

*s/ Tom Merriman*
Tom Merriman (0040906)
Paul Grieco (0064729)
Hannah Klang (0090470)
LANDSKRONER GRIECO MERRIMAN LLC
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
T. (216) 522-9000
F. (216) 522-9007
E. tom@lgmlegal.com
Counsel for Plaintiff