| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| Office of the Staff Judge Advocate<br>US Army Cadet Command and Fort Knox<br>50 Third Avenue, Suite 229<br>Fort Knox, Kentucky 40121-5230 | Denise Snyder, Administrator of the Estate of Bryan Bargar<br><br>(See attached Continuation Sheet) |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY   ☒ CIVILIAN | | Divorced | 09/10/2016    Saturday | 6:00 P.M. |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

The Wrongful Death and Survivorship claims of the Estate of Bryan Bargar arise out of the double-fatal motor vehicle crash caused by PFC Jeremy R. Taylor (DOB: ▮▮▮▮) of 1-145th Armored Regiment of the Ohio National Guard which occurred on September 10, 2016 in Ravenna Township, Ohio.

A detailed description of the basis for these claims is set forth in the attached Continuation Sheet.

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

Bryan
▮▮▮▮ Bargar (dec.)  See attached Continuation Sheet.

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

See attached Continuation Sheet.

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

Claimant is seeking damages for Wrongful Death and Survivorship claims. A detailed description of the basis for these claims is set forth in the attached Continuation Sheet.

| 11. | WITNESSES | |
|---|---|---|
| NAME | ADDRESS (Number, Street, City, State, and Zip Code) | |
| See attached Continuation Sheet | | |

| 12. (See instructions on reverse). | | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). | |
| 15,770.59 | 1,500,000 | 18,034,868.13 | 19,550,638.72 | |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| *(signature)* | 216-219-7695 | 08-08-2018 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable
95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

OSJA, Claims, HQ, USACC
Ft. Knox, KY 42701

Recv'd 13 Aug 2018

Army Claim #18-201-T068

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident Insurance? ☒ Yes   If yes, give name and address of insurance company (Number, Street, City, and Zip Code) and policy number.   ☐ No

Progressive Direct Insurance /  Policy #901405647
P.O. Box 31206
Tampa, FL   33631

| 16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible? ☒ Yes ☐ No | 17. If deductible, state amount. |
|---|---|
| Deductible.  Property damage for loss of automobile. | 500.00 |

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts.)
See attached Continuation Sheet.

19. Do you carry public liability and property damage insurance? ☒ Yes   If yes, give name and address of insurance carrier (Number, Street, City, and Zip Code).   ☐ No

Progressive Direct Insurance /  Policy #901405647
P.O. Box 31206
Tampa, FL   33631

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident.  If the incident involves more than one claimant, each claimant should submit a separate claim form.**

### Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid.  A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted.  Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14.  Many agencies have published supplementing regulations.  If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant.  A claim presented by an agent or legal representative must be presented in the name of the claimant.  If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A <u>**SUM CERTAIN**</u> FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

*(a)*  In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)*  In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)*  In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident.  Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)*  **Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.**

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

   A.  *Authority:*  The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B.  *Principal Purpose:*  The information requested is to be used in evaluating claims.
C.  *Routine Use:*  See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D.  *Effect of Failure to Respond:*  Disclosure is voluntary.  However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is <u>solely</u> for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501.  Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention:  Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC  20530 or to the Office of Management and Budget.  Do not mail completed form(s) to these addresses.

**STANDARD FORM 95** REV. (2/2007) **BACK**

OSJA, Claims, HQ, USACC
Ft. Knox, KY 42701

Recv'd 13 Aug 2018

Army Claim #18-201-T068

# SF95 Continuation Sheet

**BLOCK 2.     NAME, ADDRESS OF CLAIMANT**

Denise Snyder, Administrator of the Estate of Bryan Bargar

Address:                              c/o Landskroner Grieco Merriman LLC
                                      1360 W. 9th St. #200
                                      Cleveland, OH  44113

Social Security Number
     of Bryan Bargar (dec.):         ███████████

E-mail Address:                      tom@lgmlegal.com

Authorized Attorney:                 Tom Merriman
                                     Landskroner Grieco Merriman LLC

*See **Exhibit 1, Entry Appointing Fiduciary, Probate Court of Cuyahoga County, Ohio;
Exhibit 2, Bryan M. Bargar Certificate of Death;
Exhibit 3, Attorney Authorization.***

---

**BLOCK 4.     DATE OF BIRTH**

Note:  Date of Birth provided is the DOB of decedent Bryan Bargar (not administrator Denise Snyder).

---

**BLOCK 5.     MARITAL STATUS**

Note: Marital Status provided is the marital status of decedent Bryan Bargar at the time of his death.  He was divorced.  Administrator Denise Snyder is married.

---

## BLOCK 6.    BASIS OF CLAIM

### I.    The Double-Fatal Motor Vehicle Crash

The claims of the Estate of Bryan Bargar arise out of the double-fatal motor vehicle crash which occurred on September 10, 2016, in Ravenna Township, Ohio.[1] Liability is beyond dispute.  As detailed with citations noted below, both the Ohio State Highway Patrol Crash Reconstruction and Analysis Unit and the highly respected, ACTAR-certified crash reconstruction experts retained by the Estate of Bryan Bargar have independently concluded that Ohio Army National Guard PFC Jeremy R. Taylor, of the 1st Battalion, 145th Armored Regiment, drove a High Mobility Multipurpose Wheeled Vehicle ("military Humvee") left of center, struck a PT Cruiser, and then hit a Kia killing Bryan Bargar and his six-year old son Wyatt ██████.[2]  Bryan Bargar not only

---

[1] *Exhibit 4, Ohio State Highway Patrol Crash Scene and Vehicle Damage Photographs ("Highway Patrol Photographs");*
*Exhibit 5, Coroner of Portage County, Ohio, Investigation Photographs   ("Coroner Investigation Photographs").*

[2] *Exhibit 6, Ohio State Highway Patrol Reconstruction Report 2016-1098-67 ("Highway Patrol Reconstruction Report");*
*Exhibit 7, Introtech Crash Reconstruction Report Prepared by Henry P. Lipian (ACTAR #83) and Choya R. Hawn (ACTAR #853) ("Introtech Reconstruction Report");*
*Exhibit 8, Introtech Scene Photographs;*
*Exhibit 9, Curriculum Vitae of Henry Lipian ("Lipian CV");*
*Exhibit 10, Curriculum Vitae of Choya Hawn ("Hawn CV");*
*Exhibit 11, Ohio State Highway Patrol Crash Report at 0016 ("Highway Patrol Crash Report").*

experienced pre-impact fright, he remained conscious and suffered excruciating pain for approximately 37 minutes after the crash.[3]

Based upon the evidence gathered by the Highway Patrol, a Portage County (Ohio) Grand Jury indicted PFC Taylor on two counts of Vehicular Homicide, two counts of Vehicular Manslaughter, and one count of failing to drive a motor vehicle upon the right half of the roadway in violation of Ohio Revised Code §§ 2903.06(A)(3)(a)(C), 2903.06(A)(4)(D), and 4511.25.[4]

PFC Jeremy R. Taylor was negligent and negligent *per se* in his operation of the military Humvee. PFC Taylor not only violated the O.R.C. provisions set forth in the criminal indictment, he violated multiple other motor vehicle safety rules codified by the O.R.C. including, but not limited to, §§ 4511.202, 4511.21, 4511.26, 4511.29, and 4511.33. The Army National Guard was also negligent in its supervision and training of Taylor. PFC Taylor's negligence and negligence *per se* directly and proximately caused injury, including conscious pain and suffering, and death to Bryan Bargar. The Army National Guard's negligent supervision and training of Taylor also directly and proximately caused injury, including conscious pain and suffering, and death to Bryan Bargar. Additionally, both PFC Taylor and the Army National Guard negligently inflicted emotional distress upon Bryan Bargar, directly and proximately causing Bryan

[3] *Exhibit 12, Affidavit of Ravenna City Fire Department Paramedic Matthew J. Bowery (with Prehospital Care Report Summary attached as Affidavit Exhibit A) at ¶ 9 ("Bowery Affidavit")*
[4] *Exhibit 13, Portage County Grand Jury Indictment of Jeremy R. Taylor.*

to experience pre-impact fright, emotional distress related to witnessing the horrific crash which killed his six-year old son Wyatt ███████, and the emotional distress associated with his own conscious pain and suffering during his final 37 minutes of consciousness. At all relevant times, PFC Taylor was acting within the course and scope of his duties with the Ohio Army National Guard and engaged in training activities mandated by 32 U.S. Code §502 and/or by orders of the Secretary of the Army.

## A.  The Accident Reconstruction Reports

Sgt. R.J. Fox (U-1316) of the Ohio State Highway Patrol Crash Reconstruction and Analysis Unit conducted a crash reconstruction and produced Reconstruction Report No. 2016-1098-67 (the "Highway Patrol Reconstruction Report").[5] The Estate of Bryan Bargar (along with the Estate of Wyatt Bentley) also retained Introtech Reconstruction Services to perform a crash reconstruction and produce an expert report (the "Introtech Reconstruction Report"). Henry P. Lipian (ACTAR #83) served as the Primary Reconstructionist.[6] He was assisted by Choya Hawn (ACTAR #853). Mr. Lipian's opinions are "rendered to a reasonable degree of scientific certainty" based upon the "data and evidence currently available."[7]

---

[5] *Ex.  6, Highway Patrol Reconstruction Report.*
[6] *Ex. 7,  Introtech Reconstruction Report;  Ex. 8, Introtech Scene Photographs; Ex. 9, Lipian CV; Ex. 10, Hawn CV;*
[7] *Ex. 7, Introtech Reconstruction Report at 0025.*

### B. The Involved Vehicles

At approximately 6:00 p.m. on Saturday, September 10, 2016, a three-vehicle convoy of Ohio Army National Guard soldiers was traveling from Camp Perry to the Camp Ravenna Joint Military Training Center.[8]  The convoy consisted of a personally-owned pickup truck followed by two High Mobility Multipurpose Wheeled Vehicles ("military Humvees").  **PFC Jeremy Taylor** (age █) was on duty and driving the third (and last) vehicle in the convoy, a 2009 AM General 1165A1 Expanded Capacity HMMWV with Ohio license plate number NZ2P4M (the "Taylor Humvee").[9]

As the convoy headed southeast on State Route 14, aka Cleveland-E. Liverpool Road (hereinafter "SR 14") in Ravenna Township, Taylor was traveling in the left lane heading towards the intersection of Lake Rockwell Road.[10]  **PFC Cole Bright** (front seat), **PFC Christian Ibarra**, and **PFC Christian Gaiters** were passengers in the Taylor Humvee.[11]

**Bryan Bargar** (age █) was driving his 2015 Kia Optima LX (Ohio license plate FFJ 3504) northwest on SR 14.[12]  Bryan's six-year old son **Wyatt** █████ was in the back

---

[8] *Ex. 11, Highway Patrol Crash Report at 0016.*
[9] *Ex. 6, Highway Patrol Reconstruction Report at 0003-4.*
[10] *Ex. 11, Highway Patrol Crash Report at 0016.*
[11] *Id. at 0015.*
[12] *Id. at 0016.*

seat on the passenger's side.  Both Bryan and Wyatt were wearing lap and shoulder safety belts.[13]

### C.  Road Layout and Conditions

SR 14 is an east-west roadway.  In the area near the Lake Rockwell intersection (the "intersection"), however, it is predominantly oriented in a northwest to southeast direction.  Immediately north of the intersection, SR 14 is a four-lane roadway (two southbound and two northbound lanes).  South of the intersection, SR 14 becomes a three-lane roadway.  There are two dedicated northbound lanes and one dedicated southbound lane.  Nevertheless, the southbound lane "remains wide enough to accommodate two vehicles for a brief period before merging back into a single southbound lane of travel."[14]  The southbound lane is approximately 23 feet wide.[15]

North of the intersection, there are two yellow traffic signs alerting southbound drivers to the merging lanes ahead.  The first sign reads, "RIGHT LANE ENDS."  The second sign is a "merge lane ahead" symbol sign.[16]  The posted speed limit is 55 miles per hour.[17]

---

[13] *Ex. 12, Bowery Affidavit at ¶ 9; Ex.6, Highway Patrol Reconstruction Report at 0015; Ex. 7, Introtech Reconstruction Report at 0011.*

[14] *Ex.6, Highway Patrol Reconstruction Report at 0003; Ex. 7, Introtech Reconstruction Report at 0001, Photograph identified as Figure #1 at 0002, and Aerial View Sketch identified as Figure #3 at 0005;*

[15] *Ex. 7, Introtech Reconstruction Report at 0001.*

[16] **Exhibit 14, Google Maps Photographs;**

The Highway Patrol Crash Report notes, "It was reported by several witnesses that there was heavy rain and water on the roadway."[18]  In his statement to the Highway Patrol, PFC Gaiters described the road conditions as, "Really bad…It was raining pretty hard."[19] PFC Bright stated, "They were very slick. You could hydroplane easy."[20]

The Highway Patrol Crash Report does not identify visibility as a contributing factor in the crash.  **SPC Adam J. Boey**, commander of the Lead Humvee, indicated in his witness statement, *"It was pretty visible."*[21]  PFC Gaiters agreed, *"It was pretty farely (sic) good."*[22]  Weather data from the Ravenna Airport documented visibility of "10 miles with scattered clouds."[23]  PFC Bright, however, claimed visibility was "zero to none, could barely see 5-6 meters [a]head max."[24]

---

**Exhibit 15, United States Army Accident Safety Investigation Powerpoint Report titled, "Ravenna Accident HMMVW Class-A On Duty 10 September 2016 at 0014-0016 ("Army Accident Safety Investigation Report").**

[17] *Ex. 7, Introtech Reconstruction Report at 0001 (The Crash Report erroneously identifies the posted speed limit to be 50 mph.  During their November 28, 2016, inspection of the crash site, Introtech investigators documented the posted speed limit to be 55 mph).*

[18] *Ex. 11, Highway Patrol Crash Report at 0016.*

[19] *Id. at 0048.*

[20] *Id. at 0060.*

[21] *Id. at 0070.*

[22] *Id. at 048.*

[23] *Ex. 7, Introtech Reconstruction Report at 0001.*

[24] *Ex. 11, Highway Patrol Crash Report at 0060.*

### D.  Events Leading Up to the Crash

As the convoy traveled southbound on SR 14 approaching the intersection, the Lead Humvee passed a school bus which was traveling in the right lane.[25] The Taylor Humvee was traveling in the left lane some distance behind the school bus (which was still traveling in the right lane).  PFC Bright (front-seat passenger) told the Highway Patrol, *"Taylor stated the convoy was pulling away."*[26]

The Highway Patrol obtained video of the final seconds before the crash which were recorded by an exterior surveillance "video system installed at a private property business [which] captured all three vehicles (Lead Humvee, school bus, and Taylor Humvee) prior to the crash" as they crossed the intersection.[27]  The Ohio Department of Public Safety Video and Analysis Unit produced still frame photographs of the surveillance video which was "recorded at seven (7) frames per second." [28]

Frame #1 of the video is time-stamped by the video recording system as being recorded at "9/10/16 6:02:30."[29]  Correlating with public records of the crash, 6:02:30 is 6:02:30 p.m. civilian time or 180230 military time.  In Frame #1, the Lead Humvee is seen

---

[25] *Ex. 11, Highway Patrol Crash Report at 0072.*
[26] *Id. at 0061.*
[27] *Ex. 6, Highway Patrol Reconstruction Report at 0009;*
   **Exhibit 16, Surveillance Video** (*The surveillance video also appears to capture the personally-owned pickup truck which was leading the convoy.  It appears to be approximately seven (7) seconds ahead of the Lead Humvee.*).
[28] *Ex. 6, Highway Patrol Reconstruction Report at 0009;*
   **Exhibit 17, Surveillance Video Still Frame Photographs ("Still Frame Photos").**
[29] *Id.*

entering the picture just north of the intersection and passing a cemetery sign/flagpole. In Frame #11, the Lead Humvee is seen passing a stop sign (for Lake Rockwell Road traffic). Based upon the video, crash scene measurements, and a scale diagram of the two fixed points (cemetery sign/flag pole and the stop sign), the Highway Patrol Reconstruction Report calculated the speed of the Lead Humvee "at approximately 44.7 mph."[30]

Using the same analysis, the Highway Patrol calculated "the **yellow school bus** (which first appears in Frame #12) at approximately **38.8 mph** as it entered and moved across the area within video range." (emphasis added)[31] The Highway Patrol Reconstruction Report further notes, "During this portion, it is stated by witnesses that the bus was changing lanes."[32] The Taylor Humvee is seen entering the video range in Frame #31 which is time-stamped at "9/10/16 6:02:33." Watching the surveillance video, it appears the Taylor Humvee is rapidly gaining on the school bus. The Highway Patrol concluded that the **Taylor Humvee** "was traveling at approximately **47.9 mph**…approaching the intersection."(emphasis added)[33]

It should be noted that the speed calculations performed by the Ohio Highway Patrol track the speed of the vehicles as they traveled across the video range and through the intersection. They do not reflect the speeds of the vehicles before they were

---

[30] *Ex. 6 at 0011, Ex. 17, Still Frame Photos.*
[31] *Ex. 6, Highway Patrol Reconstruction Report at 0013, Ex. 17, Still Frame Photos.*
[32] *Id.*
[33] *Ex. 6, Highway Patrol Reconstruction Report at 0015, Ex. 17, Still Frame Photos.*

in view of the surveillance camera. PFC Taylor told the Ohio Highway Patrol that he was driving, *"a little over I think 50 mph."*[34] PFC Gaiters stated that Taylor, *"told me he was going 5 mph over."*[35] PFC Ibarra admitted in his statement, *"We were going fast,"* but when asked specifically how fast Taylor was driving, Ibarra responded, *"The speed limit."*[36] PFC Bright indicated, "Taylor stated the convoy was pulling away."[37] Bright, however, did not believe Taylor was driving over the posted speed limit, *"He was trying to keep up and be safe."*[38]

### E. The Taylor Humvee Crosses the Center of the Roadway Causing the Initial Collision

As the school bus traveled through the intersection, it began to merge into the left lane. There is no evidence that the school bus engaged in a cut-off maneuver. In fact, when the Taylor Humvee first appears in the video, it is approximately thirty-nine (39) feet behind the slower-moving school bus.[39] Mr. Lipian opined,

> *Based upon the relative closing velocities of the bus and the Taylor Humvee, even if the bus engaged in a cutoff maneuver...**Jeremy Taylor had approximately 4.3 – 9.0 seconds to simply slow to parity speed with the school bus before reaching an imminent collision.** If Mr. Taylor was normally alert and paying reasonable attention to his driving task, with the available time to avoid a crash, there was no need to take dramatic evasive action.*[40] (emphasis added)

---

[34] *Ex. 11, Highway Patrol Crash Report at 0018.*

[35] *Id. at 0052.*

[36] *Id. at 0055, 0058.*

[37] *Id. at 0061.*

[38] *Id.*

[39] *Ex. 7, Introtech Reconstruction Report at 0016.*

[40] *Id. at 0017.*

According to Ibarra, *"we were pretty far behind the bus, the bus lane ended so he came into our lane…I heard Gaiters say to Taylor to slow down. There was a bus trying to merge."*[41] Gaiters told the Highway Patrol that Bright *"was telling Taylor to look out."*[42] Bright indicated in his statement that he had *"no idea"* how far away from the school bus they were when it started to merge. Bright stated, *"I don't believe or know if [Taylor] was trying to pass the bus or stay behind."*[43]

Taylor claimed in his written statement to the Highway Patrol that he slammed on the brakes to avoid hitting the bus.[44] There is no physical evidence identified in either the Highway Patrol Reconstruction Report or the Introtech Reconstruction Report to substantiate that a "hard-braking event" occurred.[45]

The Highway Patrol concluded from the eyewitness statements, physical evidence, and video recordings that the Taylor Humvee *"went left of center and struck a red PT Cruiser in a sideswipe fashion."* (the "initial collision")[46] Mr. Lipian further opined, *"In order for the Humvee to have been left of center to the extent and angle that it was required left steering input by Mr. Taylor.[47]"*

---

[41] *Ex. 11, Highway Patrol Crash Report at 0054, 0057.*
[42] *Id. at 0050.*
[43] *Id. at 0063, 0064.*
[44] *Id. at 0018*
[45] *Ex. 7, Introtech Crash Report at 0017.*
[46] *Ex. 6, Highway Patrol Reconstruction Report at 0017.*
[47] *Id.*

Lisa M. Mancini was driving the PT Cruiser in the left northbound lane at the time of the initial collision. She told investigators that the Taylor Humvee was 10-15 feet in front of her when it went left of center.[48] At Frame #47, which is time-stamped "9/10/16 6:02:35" (180235), the Taylor Humvee is seen colliding with a red Chrysler PT Cruiser at the southern edge of the intersection. At the time of the initial collision, the Taylor Humvee was still behind the school bus.[49] PFC Ibarra confirmed, *"We went into the other lane."*[50]

### F. The Taylor Humvee Slams Head-on Into Bryan Bargar's Kia in the Northbound Lanes

After hitting the PT Cruiser, the Taylor Humvee *"continued into the northbound lane"*[51] According to witnesses, *"Taylor continued to travel left of center and struck [Bryan Bargar's Kia] head on."*[52] Civilian eyewitness Austin Felser was driving in the northbound left lane on SR 14 "at least" thirty (30) feet behind Bargar's Kia. Felser stated that the Kia was traveling in the left northbound lane when it was hit by the Taylor Humvee.[53] The crash was not captured on surveillance video because the

---

[48] *Id.* at 0027.
[49] *Ex. 16, Surveillance Video; Ex. 17, Still Frame Photos.*
[50] *Ex. 11, Highway Patrol Crash Report at 0057.*
[51] *Id.* at 0017.
[52] *Id.* at 0016.
[53] *Id.* at 0030.

camera's view was obstructed by a shed. Debris from the crash, however, is seen bouncing across the roadway at 6:02:37 (180237).[54]

It is beyond dispute that the Taylor Humvee hit Bargar's Kia after crossing into the northbound lanes of traffic. Through his reconstruction of the crash, Sgt. Fox concluded, *"The [Taylor] Humvee struck the Kia Optima within the right northbound lane of SR 14 and had an approximate impact speed of 39.0 mph."*[55] During their scene visit, Introtech investigators documented *"gouges, chops, and grooves"* in the asphalt of the right northbound lane.[56] Primary Reconstructionist Henry Lipian concluded, based upon Felser's eyewitness statement and the physical evidence, *"at the first point of contact [with the Taylor Humvee], the Kia was likely in the left lane and then was pushed sideways to its maximum engagement point in the right lane where the predominant concentration of gouges was located."*[57] The *"maximum engagement point"* of two vehicles *"is the most violent part of the crash."*[58]

The Taylor Humvee, with a gross weight of approximately 8,200 pounds, slammed head-on into the Kia with tremendous force.[59] Mr. Lipian explained, *"Any crash delta [velocity] of more than 30 MPH is considered a severe crash."*[60] Delta velocity or

---

[54] *Ex. 16, Surveillance Video.*
[55] *Ex. 7, Highway Patrol Reconstruction Report at 0017.*
[56] *Ex. 7, Introtech Reconstruction Report at 0006-0007.*
[57] *Id. at 0007.*
[58] *Id.*
[59] *Id. at 0002, 0012.*
[60] *Id. at 0012.*

"delta v" is the impact speed change. The air bag control module ("ACM") on the Kia recorded a maximum delta velocity of 50.33 mph for the Kia during the initial impact. Bryan Bargar sustained a gravitational load of *"99 times"* his normal body weight. A *"secondary collision between the t*wo vehicles [occurred] *as they both rotated during the collision sequence."*[61]  Both the Taylor Humvee and the Kia *"traveled off the southeast side of SR 14 and came to final rest."*[62]

## II.     Bryan Barger's Pre-Impact Terror

The Kia's ACM data documented the evasive actions Bryan Bargar undertook seconds before the crash in a desperate (and futile) attempt to avoid a head-on collision with the oncoming military vehicle.  As detailed in the Introtech Reconstruction Report, Henry Lipian concluded that:

> *Mr. Bargar's driving actions as recorded by the ACM demonstrated that he perceived a hazard, responded and began to take evasive action <u>before the collision took place</u>.  Thus, Mr. Bargar cognitively recognized the threat posed by the path intruding Humvee and made decisions about evasive actions, and then engaged in those actions.  There was a conscious understanding on the part of Mr. Bargar that he was about to be involved in a collision.*
> \*\*\*
> *Mr. Bargar began to perceive the path intruding Humvee approximately 2.5 seconds before impact.* [63]

Bryan's conscious fright in those 2.5 seconds before the crash would have been further exacerbated by the massive size and intimidating stature of the Taylor Humvee

---

[61] *Id.*
[62] *Ex. 6, Highway Patrol Reconstruction Report at 0017.*
[63] *Ex. 7, Introtech Reconstruction Report at 0011, 0021* (underline original).

and Bryan's knowledge that his young son Wyatt's life was also in peril. As detailed below, there is no evidence Bryan lost consciousness. His conscious fright would have continued as his Kia was sent into a spin before it was struck a second time by the Humvee.[64]

### III. Bryan Bargar's Conscious Pain & Suffering

Bryan Bargar was conscious and experiencing severe pain and suffering for at least 37 minutes after the crash.[65] During those final 37 minutes of consciousness, Bryan was entrapped in the Kia with the "deformed dashboard of the car…pushed downward pinning [his] legs."[66] Suffering from massive internal injuries caused by multiple blunt force traumas, Bryan was slowly dying from mechanical asphyxiation.[67]

According to the Highway Patrol Crash Report, the crash occurred at "1800."[68] Debris from the crash is first observable on the time-stamped surveillance video at 18:02:37.[69] The 911 Call Spreadsheet produced by the Portage County Sheriff's Office

---

[64] *Id. at 0011.*

[65] *Ex. 12, Bowery Affidavit at ¶ 20;*
 ***Exhibit 18, Report of Investigation, Office of the Coroner, Portage County, Ohio re:***
  ***Death of Bryan Bargar ("Coroner's Report") at 0007-0010;***
 ***Exhibit 19, Portage County Sheriff's Office 911 Call Spreadsheet ("911 Call***
  ***Spreadsheet");***
 ***Exhibit 20, Forensic Medical Expert Report of Elizabeth K. Balraj, M.D. ("Balraj***
  ***Report").***

[66] *Ex. 12, Bowery Affidavit at ¶ 10;*

[67] *Ex. 13, Bowery Affidavit at ¶ 11-20; Ex. 18, Coroner's Report at 0005; Ex. 20, Balraj Report*
  *at 0001-0002.*

[68] *Ex. 11 Highway Patrol Crash Report at 0001.*

[69] *Ex. 16, Surveillance Video.*

documented the first call reporting the crash at 18:03.[70]  At 18:12:41, Ravenna City Fire

Department personnel were dispatched, along with several other local fire departments,

to provide mutual aid to the Ravenna Township Fire Department.[71]

At 6:18 p.m. (18:18), Ravenna City Firefighter/Paramedic Matthew J. Bowery

climbed into the front passenger seat of the badly damaged Kia to provide medical

treatment to Bryan as other firefighters worked to extricate him from the vehicle.[72]

Paramedic Bowery described the scene in the narrative history of the Ravenna City Fire

Department Prehospital Care Report Summary ("Prehospital Care Report"):

> *"Patient is trapped in driver's seat.  Inward intrusion noted on driver's door.  Dashboard deformity downward pinning legs.  Steering wheel completely broken from shaft and ultimately removed.  Side curtain and driver's airbags deployed upon impact.  Seatbelts present and properly on occupants.  From the visible portion of patient's body there appeared to be a head injury due to placement of the glass on driver door window. Multiple open fractures on right hand.  Deep laceration on right arm with venous bleeding.  Multiple abrasions the length of left arm, and a large quantity of blood present on floor of car…Due to placement of military vehicle only option to remove patient is to cut off roof and roll the dashboard forward.  It was attempted to push the military vehicle with it in neutral with help of all bystanders at the scene.  The vehicle was too heavy to move…Throughout the removal process patient steadily declined in condition."*
> (All CAPS removed)[73]

Paramedic Bowery made contemporaneous entries into a tablet computer using

Health EMS software as he treated Bryan in the vehicle.[74]  This created a time-stamped

---

[70] *Ex. 19, 911 Call Spreadsheet.*

[71] *Ex. 12, Bowery Affidavit at ¶7; Ex. 18, Coroner's Report at 0006.*

[72] *Ex. 12, Bowery Affidavit at ¶11; Ex. 18, Coroner's Report at 0006.*

[73] *Ex. 12, Bowery Affidavit at Affidavit Exhibit A; Ex. 18, Coroner's Report at 0010. (The Prehospital Care Report appears in the record both as an exhibit to the Bowery Affidavit and in the Coroner's Report).*

record of Bryan's declining medical condition which appears in the Prehospital Care Report.[75]  Bowery observed that Bryan Barger remained conscious until 18:40.  In his attached affidavit, Bowery testifies:

> "From 6:18 p.m. (when I first assessed Mr. Bargar) until 6:40 p.m. (when assisted ventilations with the BVM began), Bryan Bargar was conscious.  He opened his eyes and gave verbal responses (albeit not understandable) to my verbal commands, followed my instructions for short periods of time (i.e., "Hold still"), and withdrew from pain while I was examining him and providing treatment."[76]

Bryan's heart finally went into asystole at 7:04 p.m. before firefighters, with the aid of a heavy tow truck, were able to extract him from the vehicle.[77]  At approximately 7:21 p.m., the Portage County Coroner arrived and confirmed Bryan was deceased at the scene.[78]

The Estate of Bryan Bargar has retained Forensic Pathologist Elizabeth K. Balraj, M.D. to serve as its medical expert.[79]  Dr. Balraj served as the Coroner of Cuyahoga County, Ohio, for twenty (20) years (1987-2007) and served as an Assistant Professor of Forensic Pathology at Case Western Reserve University School of Medicine for thirty-one (31) years (1978-2009).[80]  During her two decades as Coroner of Ohio's largest

---

[74] *Ex. 12, Bowery Affidavit at ¶12.*

[75] *Ex. 12, Bowery Affidavit at Affidavit Exhibit A;  Ex. 18, Coroner's Report at 0006-0010. (The Prehospital Care Report appears in the record both as an exhibit to the Bowery Affidavit and in the Coroner's Report).*

[76] *Ex. 12, Bowery Affidavit at ¶20.*

[77] *Id. at ¶19.*

[78] *Ex. 11, Highway Patrol Crash Report at 0016.*

[79] *Ex. 20, Balraj Report.*

[80] **Exhibit 21, Curriculum Vitae of Elizabeth K. Balraj, M.D. ("Balraj CV").**

county, Dr. Balraj led the forensic investigation of 2,500-3,500 sudden and violent deaths each year, determining the circumstances surrounding those fatal injuries and rendering conclusions on the manner by which those injuries and deaths were sustained.[81] She has "testified in Court as an Expert Witness in excess off one hundred (100) times."[82] Dr. Balraj is arguably the most respected, experienced, and knowledgeable forensic pathologist in Ohio.

Dr. Balraj has opined on Bryan's mechanism of death as well as Bryan's post-impact consciousness prior to his death:

> *"In conclusion based upon a reasonable degree of medical certainty, it is my expert opinion that Mr. Bryan Bargar died as a result of Mechanical Asphyxia due to Multiple Blunt Force Trauma … Bryan Bargar was alive following this accident and conscious prior to his death. Furthermore during his time of consciousness [h]e was capable of experiencing pain and suffering."[83]*

Dr. Balraj's opinion confirms Paramedic Bowery's detailed, eyewitness account of Bryan Bargar's excruciating conscious pain and suffering as he was entrapped in the vehicle while slowly dying from his extensive traumatic injuries.

### IV. Bryan Bargar's Mental Anguish Related to Witnessing His Son's Death

Ohio law is well settled that family members who sustain physical injury in a fatal motor vehicle accident have claims for the negligent infliction of emotional distress

---

[81] *Ex. 20, Balraj Report at 0003.*
[82] *Id.*
[83] *Id. at 0002.*

related to their witnessing of a loved one's death. Such claims are distinct (and not derivative) from any wrongful death claim brought by the estate of the loved one.[84]

Bryan Bargar not only witnessed the horrific crash which killed his six-year-old son Wyatt ███, he remained conscious (entrapped in the front seat) as paramedics provided medical care and extricated Wyatt from the Kia.[85] The Estate's Survival Claim is thus further based upon the mental anguish Bryan experienced during his final 37 minutes of consciousness related to witnessing the fatal crash which caused Wyatt's death.

## V.    Circumstances Contributing to the Double Fatal Crash

The United States Army Accident Safety Investigation identified multiple incidents of "Leadership Failure" that were "Present and Contributing" factors in the crash.[86] These include:

- **"NCOIC was AWOL Friday morning: Recovery team sent to HOR."**[87] The 1-145th Armored Regiment was to report for duty at the Newton Falls Armory at approximately 0800 Friday, September 9, 2016. The NCOIC for

---

[84] *Binns v. Fredenall, (1987) 32 OhioSt.3d 244, 246 ("The fact that mental anguish over the death of a relative is compensable in a wrongful death action does not plaintiff's recovery of damages for such injury where plaintiff suffers also suffers physical injuries in the same accident that caused the death of another. Plaintiff's recovery for mental anguish caused by the death of another, however, must be predicated upon [his] involvement in the accident, not upon the mere fact of the death, which is an aspect of a wrongful death action.").*

[85] **Exhibit 22, Report of Investigation, Office of the Coroner, Portage County, Ohio re: Death of Wyatt ███ ("Coroner's Report re: Death of Wyatt ███").**

[86] *Ex. 14, Army Accident Safety Investigation Report at 0030.*

[87] *Id.*

the mission, however, arrived 8.5 hours late. He received the "battle hand-off" at 1430. [88]

- **"Did not allow sufficient rest with planned curfew time: 3 hours."**[89] Lights out on Friday night was at 2400. PFC Taylor and the other soldiers woke up at 0300 on Saturday, September 10, 2016.[90] Thus, Taylor may have been driving with 3 hours of sleep *or less* at the time of the crash.

- **"Did not enforce vehicle rosters designed to maximize experience."**[91] In the original plan for the mission, vehicle crew members were assigned "to ensure experienced drivers in each HMMWV" and PFC Taylor was not even assigned to drive a vehicle.[92] The plan was not followed.[93] All four occupants in the Taylor Humvee had been licensed to drive HMMWV's less than four months, were 18-20 years old, had minimal experience driving HMMVW's on improved roads with civilian traffic, and no NCO's were in the vehicle.[94] The Army Accident Safety Investigation Report also identified "Human Error-Driver Crew Inexperience" as a "Present and Contributing" factor in the crash. [95]

- **"Deviated from original plan to remain overnight at Camp Perry."**[96] After waking up at 0300, driving to Camp Perry at 0430, and then engaging in an undisclosed exercise for ten (10) hours, the 1-145th Armored Regiment was supposed to remain overnight at Camp Perry. Instead, they departed in a convoy driving back to the Newton Falls Armory at 1530.[97]

---

[88] *Id. at 0008.*

[89] *Id. at 0030.*

[90] *Id. at 0008.*

[91] *Id. at 0030.*

[92] *Id. at 0009.*

[93] *Id. at 0011.*

[94] *Id. at 0005, 0032.*

[95] *Id. at 0032.*

[96] *Id. at 0030.*

[97] *Id. at 0008.*

- **"Left convoy behind after last break."[98]**
  Prior to stopping for a rest break at the Streetsboro K-Mart, Humvee D-6 was the trail vehicle in the convoy. Staff Sgt. Bettcher and Sgt. Bousay, two of the most experienced officers in the convoy, were in that vehicle.[99] Reporting "overheating issues," Humvee D-6 broke off from the convoy and left 10 minutes before the other vehicles. Thus, the Taylor Humvee, occupied by four of the youngest, least experienced soldiers in the Unit, became the trail vehicle in the convoy."

The Estate of Bryan Bargar has retained John D. Dixon to serve as its expert on military procedures, command accountability, and Department of the Army regulations.[100] Mr. Dixon is a former "Active Duty and Reserve U.S. Army Military Police enlisted soldier and Commissioned Officer who has served as a Detachment Commander, a Company Executive Officer and an Acting Company Commander."[101] (He also a former civilian police officer who is currently employed by Introtech as an ACTAR-certified Crash Reconstructionist).[102]

Mr. Dixon notes,

*"The planning for the training [weekend] was conducted by two unit readiness noncommissioned officers (RNCO). However both RNCO's went on TDY (Temporary Duty) instead of staying for the training, leaving Supply Sergeants (E-6 rank) in charge."[103]*

---

[98] *Id. at 0030.*
[99] *Id. at 0011.*
[100] **Exhibit 23, Analysis of Army Accident Safety Investigation by John D. Dixon ("Dixon Report").**
[101] **Exhibit 24, Curriculum Vitae of John D. Dixon ("Dixon CV').**
[102] *Id.*
[103] *Ex. 22, Dixon Report at 0003.*

Mr. Dixon agrees with the Army Accident Safety Investigation Report assessment of leadership failures and opines,

> "the evidence is conclusive of systemic breakdown in leadership and management of soldiers involved and the convoy…there were serious deficiencies and improprieties in the Army's implementation of this training and convoy…The glaring deficiency in the management and leadership of the soldiers and the convoy were contributing factors to the cause of the crash."[104]

Empty energy drink cans were found inside the Taylor Humvee compartment after the crash.[105]   Mr. Lipian and Mr. Hawn further observe in the Introtech Reconstruction Report:

> "Insufficient driver attention to the driving task can be fatigue related resulting in sleep-related attentional impairment which can lead to drowsiness or cognitive distraction. When a driver is fatigued they can experience insufficient attentional    effort,   which can lead to overreaction to a perceived risk.  The flawed driving actions by Mr. Taylor are consistent with a person who was distracted and therefore, not paying reasonable attention to the driving task."[106]
> ***
> "If one assumes that Mr. Taylor immediately fell asleep at 0000 and slept uninterrupted until 0300, he only had three hours of sleep.  He then traveled to Camp Perry and was returning from Camp Perry when the crash took place at 6:00 p.m. (1800 hours).  Mr. Taylor had been continuously awake for approximately 15 hours, and at the most with only 3 hours of sleep prior to 15 hours of awake time."[107]
> ***
> Even without the additional information that would be developed in depositions,   and discovery, **there is evidence that Mr. Taylor was driving in a fatigued status that significantly compromised his driving ability.  He should not have been driving."**
> (emphasis added)[108]

---

[104] *Id. at 0006-0007.*
[105] *Ex .5, Highway Patrol Photographs.*
[106] *Ex. 7, Introtech Reconstruction Report at 0022.*
[107] *Id. at 0022—0023.*
[108] *Id. at 0024.*

The evidence will ultimately confirm that the Army National Guard leaders responsible for planning and executing the unit's weekend training activities created an extremely dangerous circumstance. They put a sleep-deprived, exhausted, and inexperienced young soldier behind the wheel of a large military vehicle in a rain storm. The outcome was tragic, but not particularly surprising. PFC Taylor failed to pay reasonable attention to the road and vehicles ahead and caused the death of two innocent civilians.

### VI. Additional Supporting Evidence

Based upon the overwhelming evidence obtained by Claimant's attorney, liability should not be in dispute.[109]

[109] *See also Exhibit 25, Introtech Kia Damage Photos;*
*Exhibit 26, Introtech Humvee Damage Photos;*
*Exhibit 27, Introtech Total Station SDR Data With Scene Photos;*
*Exhibit 28, Introtech Animation Screen Shot Binder;*
*Exhibit 29, Introtech Animation Scans;*
*Exhibit 30, Introtech Coefficient of Friction Testing;*
*Exhibit 31, Introtech Coeffcient of Friction Research;*
*Exhibit 32, Introtech Kia EDR Report and EDR Data Charts;*
*Exhibit 33, Photographs of Introtech Kia Inspection and ACM Harvest;*
*Exhibit 34, Introtech Inspection of Kia Notes;*
*Exhibit 35, Kia Vinlink Specifications;*
*Exhibit 36, Introtech Inspection of Humvee Notes, Photos, Scans;*
*Exhibit 37, Humvee Specifications;*
*Exhibit 38, Microsoft Maps & Google Earth Images;*
*Exhibit 39, Sun & Moon Data;*
*Exhibit 40, Weather History from Weather Underground;*
*Exhibit 41, Army Regulation 600-34;*
*Exhibit 42, Dept. of the Army Pamphlet 385-40;*
*Exhibit 43, Department of Defense Instruction Number 6055.7;*

Claimant incorporates by reference as if fully-rewritten herein any and all facts alleged or evidence identified in or constituting any of the attached Exhibits.

Claimant also incorporates by reference as if fully re-written herein any and all facts alleged or evidence identified in or constituting any and all public records previously requested by the Estate's counsel and currently possessed by the United States Army National Guard, United States National Guard Bureau, United States Army Combat Readiness Center, United States Department of Defense, Ohio Army National Guard, Ohio Adjutant General, and/or Ohio State Highway Patrol.

*Exhibit 44, Human Factors in Traffic Crashes;*
*Exhibit 45, National Guard Regulation 385-10;*
*Exhibit 46, Ohio Driving Record Reports;*
*Exhibit 47, PT Cruiser Vinlink Specifications;*
*Exhibit 48, Dashcam Video;*
*Exhibit 49, Photographs of Bryan Bargar & Wyatt ████;*
*Exhibit 50, Photographs of Bryan Bargar with Denise & David Snyder;*
*Exhibit 51, Correspondence re: Freedom of Information Act Request;*

**BLOCK 9.    PROPERTY DAMAGE**

Bryan Bargar was the registered owner of the 2015 Kia Optima which he was driving at the time of the crash.[110]  At the time of his death, Bryan Bargar resided at 67 Aaron St., Berea, Ohio, 44017.  Bryan purchased the Kia on January 23, 2016.[111] The Kia was completely destroyed in the crash.[112]

Progressive Insurance ("Progressive") insured the Kia.[113]  Progressive determined the vehicle was totaled and assessed its pre-crash value at $15,217.59.[114]

The policy had a $500.00 deductible on its comprehensive/collision coverage.[115] Bryan had an auto loan through Prestige Financial Services, Inc. ("Prestige Financial"). He also purchased loan payoff insurance under his Progressive policy.[116]  Progressive paid Prestige Financial $14,717.69 on the auto property damage claim and $3,804.42 on the loan payment coverage claim.[117]

---

[110] *Exhibit 52, Certificate of Title;*
  *Exhibit 53, Progressive Insurance Auto Insurance Coverage Summary    ("Progressive Coverage Summary");*
  *See also Ex. 11, Crash Report at 0004.*
[111] *Exhibit 54, Carfax Vehicle History Report.*
[112] *Ex. 25, Introtech Kia Damage Photos.*
[113] *Exhibit 53, Progressive Coverage Summary.*
[114] *Exhibit 55, Salvage Title;*
  *Exhibit 56, Progressive Property Damage Valuation and Payout Documentation ("Valuation and Payout Documentation") at 0004.*
[115] *Ex. 53, Progressive Coverage Summary at 0002.*
[116] *Id.*
[117] *Ex. 56, Valuation and Payout Documentation at 0004.*

Bryan Bargar's 2015 Kia Optima is currently being stored pending the outcome of this

matter at Insurance Auto Auction, 7437 Deer Trail Lane, Lorain, Ohio 44053.

The Portage County Coroner's photographs document that Bryan was wearing a

concert t-shirt, vintage camouflage fatigue pants, white socks, and black boots. His

clothes were covered in blood.[118] Bryan also wore glasses, but they were not recovered

from the crash.[119] The Estate seeks property damage relative to Bryan's destroyed

clothing and personal items consisting of:

- Eyeglasses                              $400.00
- Concert t-shirt                         $25.00
- Vintage Camouflage Fatigue Pants        $50.00
- White Socks                             $3.00
- Boots                                   $75.00

The Estate therefore seeks property damages totaling $15,217.59.

---

[118] *Ex. 5, Coroner Investigation Photographs.*
[119] *Ex. 49, Photographs of Bryan Bargar; Ex. 50, Photographs of Bryan Bargar & Wyatt*
███.

## BLOCK 10.   PERSONAL INJURY/WRONGFUL DEATH

## I. THE WRONGFUL DEATH CLAIM

Portage County Coroner Dean J. DePerro, D.O. ruled that the manner of Bryan Bargar's death was "ACCIDENTAL" and the cause of death was "MULTIPLE BLUNT FORCE TRAUMA/ TWO MOTOR VEHICLE COLLISION."[120]   In his Supplementary Medical Certification filed with the Ohio Department of Health, Coroner DePerro described how Bryan Bargar's fatal injury occurred, "Military Motor Vehicle Lost Control and Struck Decedent's Vehicle."[121]   Forensic Pathologist Elizabeth K. Balraj, M.D., provided a more specific description of the mechanism of death opining, "Mr. Bryan Bargar died as a result of Mechanical Asphyxia due to Multiple Blunt Force Trauma."[122]

### a.      Appointment as Administrator of the Estate

The Probate Court of Cuyahoga County has appointed Bryan's sister Denise Snyder to serve as the Administrator of the Estate of Bryan Bargar.[123]

### b.      Bryan Bargar's Surviving Family

Bryan is survived by his children  (DOB: ), (DOB: ), (DOB: ), and (DOB: ), as well as his **mom Ruth Bargar** and his **sister Denise Snyder (claimant)**.[124]

---

[120] *Ex. 18, Coroner's Report at 0001.*
[121] *Id. at 0002.*
[122] *Ex. 20, Balraj Report at 0002.*
[123] *Ex. 1, Entry Appointing Fiduciary.*

All four surviving children were from Bryan Bargar's marriage to April McCartney (fka "April Bargar"). After nearly seven years together, Bryan and April agreed to end their marriage. It is notable that neither Bryan nor April retained an attorney. Instead, they jointly petitioned the Medina County (Ohio) Court of Common Pleas Division of Domestic Relations for a dissolution of their marriage. They submitted a Separation Agreement and Shared Parenting Plan in which April was the residential parent to the children five days per week and Bryan was the residential parent two days per week.[125] April wrote in a letter to the Court:

> "I would like Bryan to come see the children when ever (sic) he wants I would like shared parenting of the children and I would like Bryan to take the children places and overnight every other weekend."[126]

The Court entered a Decree of Dissolution on August 6, 2008, adopting the Separation Agreement and Shared Parenting Plan and establishing Bryan's child support obligation.[127] April McCartney later remarried and the children ultimately lived full time with her. Bryan continued to pay child support up until the time of his

---

[124] *Exhibit 57, Application to Administer, Probate Court of Cuyahoga County, Ohio.*

[125] *Exhibit 58, Certified Copy of Judgment Entry Decree of Dissolution in Medina County (Ohio) Court of Common Pleas Division of Domestic Relations Case No. 08-DR-0281 ("Decree of Dissolution").*

[126] *Id. at 0023.*

[127] *Id. at 0003.*

death.[128]  At the time of his death, Bryan was paying $144.44 per week in child support to April McCartney.[129]

Bryan had a very close relationship with his sister **Denise Snyder** and his mother **Ruth Bargar.**  They lived together in the same house.  In fact, Bryan, Ruth, Denise, Denise's husband David Snyder, their 12-year old son ████████, their 8-year old daughter ████████████, and Kevin's aunt Merry Troyer lived together as a close-knit family in Denise and David's home in Berea, Ohio.  Bryan contributed money for the family's living expenses, bought meals, and was actively involved with his niece and nephew.

After Bryan's marriage ended, he became romantically involved with Brittany Bentley.  Wyatt ██████(dec.), was the product of their relationship.[130]  Neither Wyatt nor the Estate of Wyatt ██████ are considered an heir of the Estate of Bryan Bargar under Ohio law.  Although Brittany and Bryan were no longer romantically involved at the time of his death, they remained friends.

---

[128] *Exhibit 59, Certified Copy of Ohio Department of Child and Family Services Child Support Payment History Report Case No. 7069287832 documenting payments from Bryan Bargar to April McCartney.*

[129] *Id. at 0001.*

[130] *Exhibit 60, Certified Copy of Ohio Department of Child and Family Services Child Support Payment History Report Case No. 7082179859 documenting payments from Bryan Bargar to Brittany Bentley.*

c.      **Claimant Seeks Economic & Non-Economic Damages
        on the Estate's Wrongful Claim**

Claimant Snyder, as the Administrator of the Estate of Bryan Bargar, demands economic and non-economic damages pursuant to O.R.C. § 2125.02 - Ohio's Wrongful Death statute.  Claimant seeks non-economic Wrongful Death damages for loss of the society of Bryan Bargar including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education as well as mental anguish.  The Estate seeks economic damages for the loss of support from Bryan's reasonably expected earning capacity, loss of Bryan's services, and loss of prospective inheritance.

d.      **Medical Records Related to the Accident**

Bryan Bargar died at the scene and did not receive any medical care beyond what was provided by paramedics while he was still entrapped in the Kia. Thus, there are no additional records of inpatient or outpatient care.

Bryan Bargar's heart went into asystole at 7:04 p.m.[131]   When Bryan became pulseless, he was "still entrapped from the pelvis downward by the dash and [military] vehicle."[132]   Paramedics were unable to make resuscitation attempts because of the manner in which Bryan was pinned inside the Kia.[133]   At approximately 7:21 p.m., the

---

[131] *Ex. 12, Bowery Affidavit at ¶19; Ex 18, Coroner's Report at 0009-0100.*
[132] *Ex 18, Coroner's Report at 0100.*
[133] *Id.*

Portage County Coroner arrived and confirmed Bryan was deceased at the scene.[134]

Time of Death was recorded as 7:30 p.m.[135]   The body was still entrapped in the Kia.[136]

### e.       Written Report of Claimants Attending Physician

**N/A** -  See Bowery Affidavit, Coroner's Report, and Balraj Report.[137]

### f. Itemized Bills for Medical, Dental, and Hospital Expenses

**N/A** – Bryan Bargar died at scene.[138]

### g. Documentation of Future Economic Damages

Claimant has enclosed copies of Bryan Bargar's income tax records for the five years prior to his death (2011-2015), including U.S. and Ohio income tax returns as well as the corresponding W-2's.[139]   In 2015, Bryan's gross income was $44,225.[140]  Up until

---

[134] *Ex. 11, Highway Patrol Crash Report at 0016.*

[135] *Ex 18, Coroner's Report at 0002.*

[136] *Id. at 0005.*

[137]  *Ex. 12, Bowery Affidavit; Ex. 18, Coroner's Report; Ex. 20, Balraj Report.*

[138] *Id.*

[139] ***Exhibit 61, 2015 Tax Records;***
     ***Exhibit 62, 2014 Tax Records;***
     ***Exhibit 63, 2013 Tax Records;***
     ***Exhibit 64, 2012 Tax Records;***
     ***Exhibit 65, 2011 Tax Records*** *(Note: Bryan Bargar's accountan does not have copies of*
        *the 2011 W-2's.  Claimant will supplement if they can be obtained from an*
        *alternative source);*
     ***Exhibit 66, 2016 Partial Year W-2's.***

[140] *Ex. 61, 2015 Tax Records.*

his death, Bryan was **working over 68 hours per week** at two jobs.[141] He was employed full-time as a mill operator at Superior Roll Forming Co., Inc. ("Superior") earning $17.21 per hour with full benefits and a 401(K) retirement plan.[142] From January 8 through September 10, 2016, he averaged 46.32 hours per week at Superior.[143]

Since January 7, 2014, Bryan worked a second job at Titan Restaurant Group ("Titan") delivering pizzas. He averaged 21.80 hours per week and earned $4.05 per hour plus tips.[144]

The Estate of Bryan Bargar has retained John F. Burke, Jr. Ph.D. of Burke, Rosen & Associates to serve as its expert economist.[145] Dr. Burke earned his doctorate in economics from the University of Notre Dame. He is a widely known and highly

---

[141] *Id.; **See also Exhibit 67, August 21, 2017 Letter from Superior Roll Forming Co., Inc. Human Resource Manager Theresa Laheta confirming position, wage, and benefits ("Superior Roll Forming Wage Loss Letter");
Exhibit 68, 2016 Superior Roll Forming Co., Inc. Check History Statement ("Superior Check History");
Exhibit 69, Superior Roll Forming Co., Inc. Job Application ("Superior Job Application");
Exhibit 70, Superior Roll Forming Co., Inc. Mill Operator Job Description ("Mill Operator Job Description").***

[142] *Ex. 67, Superior Roll Forming Wage Loss Letter.*

[143] *Ex. 68, Superior Check History at 0001.*

[144] ***Exhibit 71, September 18, 2017 Letter from Titan Restaurant Group Human Resources Manager Michelle Stacho with bi-weekly pay summary for 2016 ("Titan Wage Loss Letter").***

[145] ***Exhibit 72, Burke, Rosen & Associates Expert Report ("Burke Report").***

respected expert who has testified and published on topics related to future economic damages extensively.[146]

Dr. Burke has opined as follows regarding the present value of Bryan Bargar's future lost income:

> "his earning capacity measured to age 67, the earliest time he would be eligible for full social security benefits under current law, would be $1,903,505 in present value. Measured to age 65, the present value total would be $1,790,664. Measured to his statistical work life expectancy, the present value would be $1,523,352. After personal consumption is subtracted, the net loss would be $812,197 at age 67; $794,499 at age 65; and $752,574 to his work life expectancy in present value."[147]

Dr. Burke has also opined that the present value of the future services Bryan would have provided to himself and his family is $217,508.[148] Thus, the combined present value of the Estate's future economic damages (after consumption) ranges from $970,082 to $1,029,705.

### h. Funeral & Cremation Expenses

Funeral and cremation expenses totaled $5,463.13 of which $300.00 was paid by cash donations. Three individuals, including Denise Snyder, wrote checks totaling $350.00 and will be reimbursed from the Estate's recovery in this matter. Thus, the net funeral and cremation expenses after cash donations was $5,163.13.[149]

## II. THE SURVIVAL CLAIM

[146] *Exhibit 73, Curriculum Vitae of John Burke, Jr., Ph.D. ("Burke CV").*
[147] *Ex. 72, Burke Report at 0001.*
[148] *Id.*
[149] *Exhibit 74, Bauer Funeral Home, Inc. Billing Statement ("Funeral Home Billing Statement").*

Claimant, on behalf of the Estate of Bryan Bargar also seeks non-economic compensatory damages on its survival claim. As detailed in BLOCK 6, PFC Jeremy Taylor's negligence and negligence *per se* directly and proximately caused Bryan Bargar personal injuries, including conscious pain and suffering, prior to his death. The Army National Guard's negligent supervision and training of Taylor also directly and proximately caused Bryan Bargar personal injuries, including conscious pain and suffering, prior to his death.

Additionally, both PFC Taylor and the Army National Guard negligently inflicted emotional distress upon Bryan Bargar, directly and proximately causing Bryan to experience pre-impact fright, mental anguish related to the witnessing of the horrific crash which killed his six-year old son Wyatt ████, and the emotional distress associated with his own conscious pain and suffering during his final 37 minutes of consciousness.

    a.      **Bryan Barger's Pre-Impact Terror**

The Kia's ACM data documented the evasive actions Bryan Bargar undertook seconds before the crash in a desperate (and futile) attempt to avoid a head-on collision with the oncoming military vehicle. As detailed in the Introtech Reconstruction Report, Henry Lipian concluded that:

> *Mr. Bargar's driving actions as recorded by the ACM demonstrated that he perceived a hazard, responded and began to take evasive action <u>before the collision took place.</u> Thus,*

> *Mr. Bargar cognitively recognized the threat posed by the path intruding Humvee and made decisions about evasive actions, and then engaged in those actions. There was a conscious understanding on the part of Mr. Bargar that he was about to be involved in a collision.*
>
> ***
>
> *Mr. Bargar began to perceive the path intruding Humvee approximately 2.5 seconds before impact.* [150]

Bryan's conscious fright in those 2.5 seconds before the crash would have been further exacerbated by the massive size and intimidating stature of the Taylor Humvee and Bryan's knowledge that his young son Wyatt's life was also in peril. As detailed below, there is no evidence Bryan lost consciousness. His conscious fright would have continued as his Kia was sent into a spin before it was struck a second time by the Humvee.[151]

### b. Bryan Bargar's Conscious Pain & Suffering

Bryan Bargar was conscious and experiencing severe pain and suffering for at least 37 minutes after the crash.[152] During those final 37 minutes of consciousness, Bryan was entrapped in the Kia with the "deformed dashboard of the car…pushed downward pinning [his] legs."[153] Suffering from massive internal injuries caused by multiple blunt force traumas, Bryan was slowly dying from mechanical asphyxiation.[154]

---

[150] *Ex. 7, Introtech Reconstruction Report at 0011, 0021* (underline original).

[151] *Id. at 0011.*

[152] *Ex. 12, Bowery Affidavit at ¶ 20; Ex. 18, Coroner's Report at 0007-0010; Ex. 19, "911 Call Spreadsheet"); Ex. 20, Balraj Report.*

[153] *Ex. 12, Bowery Affidavit at ¶ 10;*

[154] *Ex. 13, Bowery Affidavit at ¶ 11-20; Ex. 18, Coroner's Report at 0005; Ex. 20, Balraj Report at 0001-0002.*

According to the Highway Patrol Crash Report, the crash occurred at "1800."[155] Debris from the crash is first observable on the time-stamped surveillance video at 18:02:37.[156] The 911 Call Spreadsheet produced by the Portage County Sheriff's Office documented the first call reporting the crash at 18:03.[157] At 18:12:41, Ravenna City Fire Department personnel were dispatched, along with several other local fire departments, to provide mutual aid to the Ravenna Township Fire Department.[158]

At 6:18 p.m. (18:18), Ravenna City Firefighter/Paramedic Matthew J. Bowery climbed into the front passenger seat of the badly damaged Kia to provide medical to Bryan as other firefighters worked to extricate him from the vehicle.[159] Paramedic Bowery described the scene in the narrative history of the Ravenna City Fire Department Prehospital Care Report Summary ("Prehospital Care Report"):

> "Patient is trapped in driver's seat. Inward intrusion noted on driver's door. Dashboard deformity downward pinning legs. Steering wheel completely broken from shaft and ultimately removed. Side curtain and driver's airbags deployed upon impact. Seatbelts present and properly on occupants. From the visible portion of patient's body there **appeared to be a head injury** due to placement of the glass on driver door window. **Multiple open fractures on right hand. Deep laceration on right arm with venous bleeding. Multiple abrasions the length of left arm, and a large quantity of blood present on floor of car** …Due to placement of military vehicle only option to remove patient is to cut off roof and roll the dashboard forward. It was attempted to push the military vehicle with it in neutral with help of all bystanders at the scene. The vehicle

[155] Ex. 11 Highway Patrol Crash Report at 0001.
[156] Ex. 16, Surveillance Video.
[157] Ex. 19, 911 Call Spreadsheet.
[158] Ex. 12, Bowery Affidavit at ¶7; Ex. 18, Coroner's Report at 0006.
[159] Ex. 12, Bowery Affidavit at ¶11; Ex. 18, Coroner's Report at 0006.

> *was too heavy to move…Throughout the removal process patient steadily declined in condition.* (All CAPS removed) (emphasis added)[160]

Paramedic Bowery made contemporaneous entries into a tablet computer using Health EMS software as he treated Bryan in the vehicle.[161] This created a time-stamped record of Bryan's declining medical condition which appears in the Prehospital Care Report.[162] Bowery observed that Bryan Barger remained conscious until 18:40. In his attached affidavit, Bowery testifies:

> *"From 6:18 p.m. (when I first assessed Mr. Bargar) until 6:40 p.m. (when assisted ventilations with the BVM began), Bryan Bargar was conscious. He opened his eyes and gave verbal responses (albeit not understandable) to my verbal commands, followed my instructions for short periods of time (i.e., "Hold still"), and withdrew from pain while I was examining him and providing treatment."[163]*

Bryan's heart finally went into asystole at 7:04 p.m. before firefighters, with the aid of a heavy tow truck, were able to extract him from the vehicle.[164] At approximately 7:21 p.m., the Portage County Coroner arrived and confirmed Bryan was deceased at the scene.[165]

---

[160] *Ex. 12, Bowery Affidavit at Affidavit Exhibit A; Ex. 18, Coroner's Report at 0010. (The Prehospital Care Report appears in the record both as an exhibit to the Bowery Affidavit and in the Coroner's Report).*

[161] *Ex. 12, Bowery Affidavit at ¶12.*

[162] *Ex. 12, Bowery Affidavit at Affidavit Exhibit A; Ex. 18, Coroner's Report at 0006-0010. (The Prehospital Care Report appears in the record both as an exhibit to the Bowery Affidavit and in the Coroner's Report).*

[163] *Ex. 12, Bowery Affidavit at ¶20.*

[164] *Id. at ¶19.*

[165] *Ex. 11, Highway Patrol Crash Report at 0016.*

The Estate of Bryan Bargar has retained Forensic Pathologist Elizabeth Balraj, M.D. to serve as its medical expert.[166] Dr. Balraj's extensive experience as the Coroner of Ohio's largest county and credentials as an expert forensic pathologist are detailed in Claimant's answer in BLOCK 6.[167]

Dr. Balraj has opined both the mechanism of Bryan's death as well as Bryan's post-impact consciousness prior to his death:

> *"In conclusion based upon a reasonable degree of medical certainty, it is my expert opinion that Mr. Bryan Bargar died as a result of Mechanical Asphyxia due to Multiple Blunt Force Trauma … Bryan Bargar was alive following this accident and conscious prior to his death. Furthermore during his time of consciousness [h]e was capable of experiencing pain and suffering."[168]*

Dr. Balraj's opinion confirms Paramedic Bowery's detailed eyewitness account of Bryan Bargar's excruciating conscious pain and suffering as he was entrapped in the vehicle while slowly dying from his extensive traumatic injuries.

### c. Bryan Bargar's Mental Anguish Related to Witnessing His Son's Death

Ohio law is well settled that family members who sustain physical injury in a fatal motor vehicle accident have claims for the negligent infliction of emotional distress

---

[166] *Ex. 20, Balraj Report.*
[167] *Ex. 21, Balraj CV.*
[168] *Ex. 20, Balraj Report at 0002.*

related to their witnessing of a loved one's death.  Such claims are distinct (and not derivative) from any wrongful death claim brought by the estate of the loved one.[169]

Bryan Bargar not only witnessed the horrific crash which killed his six-year-old son Wyatt ███, he remained conscious (entrapped in the front seat) as paramedics provided medical care and extricated Wyatt from the Kia.[170]  The Estate's survival claim thus includes non-economic damages related to the emotional distress and mental anguish Bryan experienced during his final 37 minutes of consciousness related to witnessing the fatal crash which caused Wyatt's death.

### III. Comparable Wrongful Death & Survivorship Claim Jury Verdicts

**A.**    **Wrongful Death Claim Total Demand:        $18,034,868.13**

Denise Snyder, Administrator of the Estate of Bryan Bargar, demands a total of $18,034,868.13 on the Estate's Wrongful Death Claim.  This figure includes both economic and non-economic damages.

---

[169] *Binns v. Fredenall, (1987) 32 OhioSt.3d 244, 246 ("The fact that mental anguish over the death of a relative is compensable in a wrongful death action does not plaintiff's recovery of damages for such injury where plaintiff suffers also suffers physical injuries in the same accident that caused the death of another.  Plaintiff's recovery for mental anguish caused by the death of another, however, must be predicated upon [his] involvement in the accident, not upon the mere fact of the death, which is an aspect of a wrongful death action.").*

[170] *Ex. 22, Coroner's Report re: Death of Wyatt ███.*

1.      **Wrongful Death Economic Damages:**                    **$1,034,868.13**

Included in the Wrongful Death demand figure, the Estate seeks $1,034,868.13 in economic damages for the loss of support from Bryan's reasonably expected earning capacity, loss of Bryan's services, and loss of prospective inheritance.   Claimant's calculation of Wrongful Death economic damages is based upon the expert opinions of Economist John F. Burke, Jr., Ph.D., all supporting wage documentation, and the documented funeral and cremation expenses.[171]   The Wrongful Death economic damages include:

| | | |
|---|---|---|
| i) | Present Value of Future Lost Income After Consumption | $812,197.00 |
| ii) | Present Value of Future Services | $217,508.00 |
| iii) | Funeral & Cremation Costs | $5,163.13 |

**TOTAL WRONGFUL DEATH ECONOMIC DAMAGES:   $1,034,868.13**

2.      **Wrongful Death Non-Economic Damages:**          **$17,000,000.00**

Also included in the Wrongful Death demand figure, the Estate seeks $17,000,000 in non-economic damages as for loss of the society of Bryan Bargar including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education as well as mental anguish.

In *Roginski v. Shelly Co., et al.,* 31 N.E. 3d. 724, 2014 Ohio Misc. LEXIS 15, (Cuyahoga County), 41-year-old Randy Roginski "died instantly" when he was struck by a car while inspecting a roadway repaving project for the Ohio Department of

---

[171] *Ex. 72, Burke Report; Ex. 73, Funeral Home Billing Statement.*

Transportation.  There was **no evidence of either pre-impact fright or conscious pain and suffering.**[172]  Mr. Roginski was standing with his back to traffic when he was struck.  Randy Roginski was survived by his wife and three children.[173]  A unanimous "jury awarded $19,000,000 on the wrongful death claim, comprised of **$17,000,000 in non-economic damages** and $2,000,000 in economic damages."[174]

The compensatory damage verdict against Defendant Shelly Co. was reduced 40% by the Court to $12,100,000 because the jury found the driver (with whom the estate had previously settled) 35% responsible, and attributed 5% comparative negligence to Mr. Roginski.[175]  There is no basis for any such reduction for comparative negligence relative to Estate of Bryan Bargar's Wrongful Death claim.  Therefore, the *Roginski* jury's award of $17,000,000 in non-economic damages on the wrongful death claim is a highly relevant benchmark.

In *Brumfield v. Tyson Foods, et al.*, (United States District Court for the Northern District of Ohio Case No. 1:05CV847), 22-year-old U.S. Marine Daniel Brumfield "was driving his pickup truck in the westbound lane of [Ohio] Route 30…when he was struck, head on, by a Tyson Foods tractor-trailer…which had crossed into the

---

[172] *Exhibit 75, Roginski v. Shelly Co. Trial Court Opinion;*
   *Exhibit 76, Roginski Lexis Jury Verdict Report.*
[173] *Exhibit 77, Cleveland.com News Article.*
[174] *Ex. 75 at 726.*
[175] *Id. at 728.*

westbound lane from the eastbound lane at about 60 mph in order to pass another vehicle."[176]

Brumfield did not have children, but a unanimous jury awarded **$6,000,000 in non-economic compensatory damages to Brumfield's parents and brother for their future loss of society and companionship** on the estate's wrongful death claim and $6,687.00 in funeral expenses.[177]

In *Christa A. Jester, on behalf of the Estate of Keith A. Jester (dec.) v. Utilimap Corporation and Duke Energy Ohio, Inc.* (Hamilton County (Ohio) Court of Common Pleas Case No. A1500283), Duke Energy lineman Keith A. Jester, age 43, was working on a utility pole which Utilimap Corporation (a Duke Energy contractor) had failed to inspect. The rotten pole collapsed and fell on top of Jester "causing blunt force trauma to his chest" resulting in "a lacerated liver, lacerated kidney, fractured sternum, and fractured ribs."[178] Mr. Jester ultimately "bled to death internally from his injuries." He was survived by his wife and three children.

---

[176] *Exhibit 78, Brumfield v. Tyson Foods, Inc. et al., 2006 Jury Verdicts LEXIS 44128 ("Brumfield Jury Verdict Report").*

[177] *Id.; See also Exhibit 79, Brumfield v. Tyson Foods, Inc. et al., U.S. District Court Northern District of Ohio Case No. 1:05CV847, Second Amended Judgment ("Brumfield Second Amended Judgment")*
*(The jury awarded an additional $1,000,000 in non-economic damages on the Estate's Negligent Infliction of Emotional Distress survival claim and $22,000 in property damage. The Honorable Donald C. Nugent added $1,056,553.87 in pre-judgment interest and assessed costs of $15,941.57 for a total award of $8,101,182.44.)*

[178] *Exhibit 80, Jester v. Utilimap Corporation, et al., 2017 Jury Verdicts LEXIS 1731 ("Jester Jury Verdict Report")*

After a three-week trial, the unanimous jury recently (June 7, 2017) awarded compensatory damages of $27,871,944. The jury's verdict included **$24,000,000 in non-economic compensatory damages** on the wrongful death claim.[179]

**B. Survival Claim:**                  **$1,500,000.00**

Denise Snyder, Administrator of the Estate of Bryan Bargar, demands a total of $1,500,000 in non-economic compensatory damages on the Estate's Survival Claim for Bryan Bargar's 37 minutes of conscious pain and suffering, the emotional distress associated with his pre-impact awareness and fear of imminent serious harm and death, as well as the mental anguish associated with witnessing of the horrifying crash which killed his six-year old son Wyatt ██████.

In *Brumfield,* the estate **"waived any post-accident conscious pain and suffering."**[180] The Brumfield estate only sought non-economic survival claim damages for "emotional injuries in the form of pre-impact awareness and fear of imminent serious harm and impending death."[181] Similar to the crash which killed Bryan Bargar, the onboard computer installed with the airbag in Daniel Brumfield's truck "indicated that Brumfield had applied his brakes about 8 seconds prior to impact and rapidly decelerated, equating to a serious level of emotional distress levied upon him prior to

---

[179] *Id.*
[180] *Exhibit 81, Brumfield v. Tyson Foods, Inc. et al., Plaintiffs' Trial Brief at 5-6 ("Brumfield Plaintiff's Trial Brief")*
[181] *Id. at 6.*

his death."[182]   The Northern District of Ohio jury in *Brumfield* awarded $1,000,000 in non-economic damages on the survival claim based solely on the "pre-impact awareness and fear of imminent serious harm and impending death."[183]

Awarding a comparable figure on the Bargar Estate's survival claim, however, would not compensate the Estate for Bryan Bargar's 37 minutes of post-impact conscious pain and suffering or his mental anguish related to witnessing the crash which killed his son Wyatt.

In *Jester*, the jury awarded $512,500 on the estate's survivor claim for Keith Jester's conscious pain and suffering (in addition to $27,359,444 on the wrongful death claim).  Mr. Jester remained "**conscious for an hour** after the incident…speaking and ask[ing] about how his coworker was, but finally lost consciousness on the way to the hospital in the ambulance."[184]

Frankly, Bryan Bargar's final 37 minutes of consciousness sound significantly worse.  Bryan remained entrapped in his vehicle, pinned underneath the collapsed dashboard, and struggling to breathe while suffering with the pain of multiple open fractures and deep wounds throughout his body.

---

[182] *Ex. 78, Brumfield Jury Verdict Report at 0002.*
[183] *Id. at 0003; Ex. 81, Brumfield Plaintiff's Trial Brief at 6.*
[184] *Ex. 80, Jester Jury Verdict Report.*

**IV.    Comprehensive List of Support Exhibits**

Exhibit No.    Description

1.    Entry Appointing Fiduciary, Probate Court of Cuyahoga County, Ohio

*2.*    Bryan M. Bargar Certificate of Death

3.    Attorney Authorization

*4.*    Ohio State Highway Patrol Crash Scene and Vehicle Damage Photographs

5.    Coroner of Portage County, Ohio, Investigation Photographs

6.    Ohio State Highway Patrol Reconstruction Report 2016-1098-67

7.    Introtech Crash Reconstruction Report

8.    Introtech Scene Photographs

9.    Curriculum Vitae of Henry Lipian

10.    Curriculum Vitae of Choya Hawn

11.    Ohio State Highway Patrol Crash Report at 0016

12.    Affidavit of Ravenna City Fire Department Paramedic Matthew J. Bowery

13.    Portage County Grand Jury Indictment of Jeremy R. Taylor

14.    Google Maps Photographs

15.    Army Accident Safety Investigation Report

16.    Surveillance Video

17.    Surveillance Video Still Frame Photographs

18.    Report of Investigation, Office of the Coroner, Portage County, Ohio re: Bryan Bargar

19.               Portage County Sheriff's Office 911 Call Spreadsheet

20.               Forensic Medical Expert Report of Elizabeth K. Balraj, M.D.

21.               Curriculum Vitae Elizabeth K. Balraj, M.D.

22.               Report of Investigation, Office of the Coroner, Portage County, Ohio re: Wyatt ████

23.               Analysis of Army Accident Safety Investigation ("Dixon Report")

24.               Curriculum Vitae of John D. Dixon

25.               Introtech Kia Damage Photos

26.               Introtech Humvee Damage Photos

27.               Introtech Total Station SDR Data with Scene Photos

28.               Introtech Animation Screen Shot Binder

29.               Introtech Animation Scans

30.               Introtech Coefficient of Friction Testing

31.               Introtech Coeffcient of Friction Research

32.               Introtech Kia EDR Report and EDR Data Charts

33.               Introtech Kia Inspection and ACM Harvest

34.               Introtech Inspection of Kia Notes

35.               Kia Vinlink Specifications

36.               Introtech Inspection of Humvee Notes, Photos, Scans

37.               Humvee Specifications

38.      Microsoft Maps & Google Earth Images

39.      Sun & Moon Data

40.      Weather History from Weather Underground

41.      Army Regulation 600-34

42.      Department of the Army Pamphlet 385-40

43.      Department of Defense Instruction Number 6055.7

44.      Human Factors in Traffic Crashes

45.      National Guard Regulation 385-10

46.      Ohio Driving Record Reports

47.      PT Cruiser Vinlink Specifications

48.      Dashcam Video

49.      Photographs of Bryan Bargar & Wyatt ███████

50.      Photographs of Bryan Bargar with Denise & David Snyder

51.      Correspondence re: Freedom of Information Act Request

52.      Certificate of Title

53.      Progressive Insurance Auto Insurance Coverage Summary

54.      Carfax Vehicle History Report

55.      Salvage Title

56.      Progressive Property Damage Valuation and Payout Documentation

57.      Application to Administer, Probate Court of Cuyahoga County, Ohio

58.     Certified Copy of Judgment Entry Decree of Dissolution in Medina County, Ohio Court of Common Pleas Division of Domestic Relations Case No. 08-DR-0281

59.     Certified Copy Ohio Department of Child and Family Services Child Support Payment History Case No. 7069287832 documenting payments from Bryan Bargar to April McCartney

60.     Certified Copy Ohio Department of Child and Family Services Child Support Payment History Case No. 7082179859 documenting payments from Bryan Bargar to Brittany Bentley

61.     2015 Tax Records

62.     2014 Tax Records

63.     2013 Tax Records

64.     2012 Tax Records

65.     2011 Tax Records

66.     2016 Partial Year W-2's

67.     Superior Roll Forming Wage Loss Letter

68.     Superior Check History

69.     Superior Job Application

70.     Superior Mill Operator Job Description

71.     Titan Wage Loss Letter

72.     Burke, Rosen & Associates Expert Report

73.     Curriculum Vitae of John Burke, Jr., Ph.D.

74.     Bauer Funeral Home, Inc. Billing Statement

75.     *Roginski v. Shelly Co.* Trial Court Opinion

76.     *Roginski* Lexis Jury Verdict Report

77.     *Cleveland.com* News Article

78.     *Brumfield v. Tyson Foods, Inc., et al.* Jury Verdict Report

79.     *Brumfield* Second Amended Judgment

80.     *Jester v. Utilimap Corporation, et al.* Jury Verdict Report

81.     *Brumfield* Plaintiff's Trial Brief

## BLOCK 11.   WITNESSES

1.    PFC Jeremy R. Taylor
      3705 Hillbrook Road
      University Hts., Ohio 44118
      ██████████████

2.    PFC Christian Ibarra
      1052 S. Seneca Road
      Alliance, OH 44601
      ██████████████

3.    PFC Cole Bright
      13676 Osborne Road
      Alliance, OH 44601
      ██████████████

4.    PFC Christian Gaiters
      1445 Clough Street #102B
      Bowling Green, OH 43402
      ██████████████

5.    Lisa M. Mancini
      4524 Coe Road #102
      Ravenna, OH 44266
      ██████████████

6.    Billy Franks
      91 Solon Road #7
      Bedford, OH 44146

7.    Austin Felser
      14356 Cedar Road
      University Hts., OH 44121
      ██████████████

8.      SPC Adam Boey
        3400 Marquette Street, NW
        Uniontown, OH 44685
        ███████████

9.      PFC Jonathan Bourgoin
        704 Battles Avenue
        Niles, OH 44446
        ███████████

10.     PFC Mark Rusell Dean
        3288 Albrecht Avenue
        Springfield Twp., OH 44312
        ███████████

11.     PFC Samuel Kasprik
        12412 W. Pleasant Valley Road
        Parma, OH 44130
        ███████████

12.     SPC Doug French
        7810 Jefferson Farms Blvd.
        New Albany, OH 43054
        ███████████

13.     Sgt. Hanson
        1st Battalion, 145th Armored Regiment
        Ohio Army National Guard
        4630 Allen Road
        Stow, OH  44224
        330.929.1267

14.     Sgt. Bouasy,
        1st Battalion, 145th Armored Regiment
        Ohio Army National Guard
        4630 Allen Road
        Stow, OH  44224
        330.929.1267

15.     SSG Bettcher
        1st Battalion, 145th Armored Regiment
        4630 Allen Road
        Stow, OH  44224
        330.929.1267

16.     Lt. Col. Daryl A. Beltz
        Commanding Officer,
        1st Battalion, 134th Field Artillery Regiment
        Ohio Army National Guard
        2825 West Dublin Granville Road
        Columbus, OH  43235-2789

17.     Sgt. Dicken
        Ohio Army National Guard
        2825 West Dublin Granville Road
        Columbus, OH  43235-2789

18.     Major Elkins
        Ohio Army National Guard
        2825 West Dublin Granville Road
        Columbus, OH  43235-2789

19.     Janet L. Blain
        Chief Warrant Officer Four
        Ohio Army National Guard
        2825 West Dublin Granville Road
        Columbus, OH  43235-2789
        614.336.7022

20.     Sgt. R.J. Fox U-1316
        Ohio State Highway Patrol
        Crash Reconstruction and Analysis Unit
        1970 W. Broad St.
        Columbus, OH  43223
        614.752.8410

21. Sgt. Troy J. Homrighausen
    Ohio State Highway Patrol- Lisbon Patrol Post
    9423 Ohio Rt. 45
    Lisbon, OH   44432
    330.424.7783

22. Lt.  J. Thorne  U-1109
    Ohio State Highway Patrol
    1970 W. Broad St.
    Columbus, OH  43223
    614.752.8410

23. Trooper L. Jordan D-4/P-67
    Ohio State Highway Patrol
    1970 W. Broad St.
    Columbus, OH  43223
    614.752.8410

24. Trooper Cannon
    Ohio State Highway Patrol
    1970 W. Broad St.
    Columbus, OH  43223
    614.752.8410

25. Trooper Colin B. Acciavatti
    Ohio State Highway Patrol
    1970 W. Broad St.
    Columbus, OH  43223
    614.752.8410

26. Deputy James
    Portage County Sheriff's Office
    Portage County Justice Center
    8240 Infirmary Road
    Ravenna, OH 44266
    330.296.5100

27.    Deputy Poundstone
       Portage County Sheriff's Office
       Portage County Justice Center
       8240 Infirmary Road
       Ravenna, OH 44266
       330.296.5100

28.    Officer Justin Leidle
       Streetsboro Police Department
       2080 OH-303
       Streetsboro, OH 44241
       330. 626.4976

29.    Officer Matt Plez
       Streetsboro Police Department
       2080 OH-303
       Streetsboro, OH 44241
       330.626.4976

30.    Officer Scott Merman
       Streetsboro Police Department
       2080 OH-303
       Streetsboro, OH 44241
       330.626.4976

31.    Officer Larson
       Streetsboro Police Department
       2080 OH-303
       Streetsboro, OH 44241
       330.626. 4976

32.    Thomas Buchanan, Esq.
       Division Chief, Portage County Prosecutor's Office
       241 South Chestnut Street
       Ravenna, OH 44266
       330.297.3850

33.     Scott Sines

        ██████████████

        (Civilian who called in crash to Ravenna Dispatch Center)

34.     Paramedic Matthew J. Bowery
        Ravenna City Fire Department
        214 Park Way
        Ravenna, OH  44266

        ████████████

35.     Dean J. DePerro, D.O., Coroner
        Portage County Coroner's Office
        226 West Harris Avenue
        Ravenna, OH   44266
        330.297.3444

36.     Dave Harmon, Investigator
        Portage County Coroner's Office
        226 West Harris Avenue
        Ravenna, OH   44266
        330.297.3444

37.     Denise Snyder
        67 Aaron Street
        Berea, OH  44017

38.     David Snyder
        67 Aaron Street
        Berea, OH  44017

39.     Ruth Snyder
        67 Aaron Street
        Berea, OH  44017

        ████████████

40. Britney Bentley
c/o Attorney John Reagan
Kisling, Nestico & Redick, LLC
3412 West Market St.
Akron, OH  44333

41. Henry Lipian, ACTAR #83          (Claimant's Expert Witness)
Introtech Crash Reconstruction Services
1006 Vivian Drive, West
Grafton, OH  44044
440.926.2627

42. Choya Hawn, ACTAR #853          (Claimant's Expert Witness)
Introtech Crash Reconstruction Services
1006 Vivian Drive, West
Grafton, OH  44044
440.926.2627

43. John D. Dixon          (Claimant's Expert Witness)
Introtech Crash Reconstruction Services
1006 Vivian Drive, West
Grafton, OH  44044
440.926.2627

44. Elizabeth K. Balraj, M.D.  (Claimant's Expert Witness)
32795 Ledge Hill Dr.
Solon, OH  44139
440.248.4337

45. John R. Burke, Jr., PhD.
Burke, Rosen & Associates
2800 Euclid Avenue, Suite 300
Cleveland, OH   44115

46. Representative of Route 14 Storage with knowledge off the surveillance cameras.

47. Representative of the Ohio Highway Patrol with knowledge of how the surveillance video was converted to Still Frame Photographs.

48. All Record Custodians necessary to authenticate records.

49.     All Individuals Identified By Defendant on its Trial Witness List
        (as if on cross-examination).

_____

## BLOCK 18.   ACTION TAKEN BY INSURANCE COMPANY ON CLAIM

Progressive Direct Insurance ("Progressive") insured Bryan Bargar's 2015 Kia Optima. The policy had a $500 deductible on comprehensive/collision coverage.[185] Bryan had an auto loan through Prestige Financial Services, Inc. ("Prestige Financial") and loan payoff (aka "gap") insurance under his Progressive policy.[186]  Progressive determined the vehicle was totaled and assessed its pre-crash value at $15,217.59.[187] Progressive paid Prestige Financial $14,717.69 on the auto property damage claim and $3,804.42 on the loan payment coverage claim.

---

[185] *Exhibit 53, Progressive Coverage Summary at 0002.*
[186] *Id.*
[187] *Ex. 55, Salvage Title;*
   *Ex.  56, Valuation and Payout Documentation at 0004.*